# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 08-36642-DOT |
| | ) | |
| CANAL CORPORATION, *et al.*, | ) | Chapter 11 |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |

## DISCLOSURE STATEMENT WITH RESPECT TO
## SECOND AMENDED JOINT PLAN OF LIQUIDATION OF
## CANAL CORPORATION AND CERTAIN OF ITS AFFILIATED DEBTORS

Dated: February 15, 2011

Benjamin C. Ackerly (VSB No. 09120)
Jason W. Harbour (VSB No. 68220)
Shannon E. Daily (VSB No. 79334)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
Telephone:  (804) 788-8200
Telecopier:  (804) 788-8218

*Attorneys for Debtors and
Debtors-in-Possession*

Peter S. Partee (VSB No. 34140)
HUNTON & WILLIAMS LLP
200 Park Avenue, 53rd Floor
New York, New York 10166-0136
Telephone:  (212) 309-1000
Telecopier:  (212) 309-1100

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Canal Corporation (f/k/a/ Chesapeake Corporation) (6880), Canal NC Company (f/k/a Chesapeake Printing and Packaging Company) (9208), Canal NY Company, Inc. (f/k/a Chesapeake Pharmaceutical Packaging Company, Inc.) (0010), Canal IH Company (f/k/a Chesapeake International Holding Company) (1532), WTM I Company (1080), Sheffield, Inc. (6314), Canal Resources Company (f/k/a Chesapeake Assets Company) (5293), Canal YR Company (f/k/a Chesapeake Recycling Company) (9383), Canal D&P Company (f/k/a Chesapeake Display and Packaging Company) (4207), Canal Virginia Company (f/k/a The Chesapeake Corporation of Virginia) (6783), Canal Corporation (Wisconsin) (f/k/a Chesapeake Corporation (Wisconsin)) (7682), Canal Corporation (Massachusetts) (f/k/a Chesapeake Corporation (Massachusetts)) (7686), Canal Corporation (D.C.) (f/k/a Chesapeake Corporation (D.C.)) (7684), Canal Corporation (Illinois) (f/k/a Chesapeake Corporation (Illinois)) (7685), Canal Corporation (Louisiana) (f/k/a Chesapeake Corporation (Louisiana)) (7681), Canal FP Company, LLC (f/k/a Chesapeake Forest Products Company, LLC) (6880), Canal DE Company (f/k/a Cary St. Company) (9092), Canal DP Company (f/k/a Delmarva Properties, Inc.) (7160), and Canal SH Company (f/k/a Stonehouse Inc.) (2481).

**THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF VIRGINIA AS COMPLYING WITH THE REQUIREMENTS OF SECTION 1125 OF THE BANKRUPTCY CODE.   THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED.    INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS SUBJECT TO COMPLETION AND AMENDMENT.**

## IMPORTANT NOTICE

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.   NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL HOLDERS OF CLAIMS AND OTHER PARTIES IN INTEREST ENTITLED TO VOTE ON THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE DISCLOSURE STATEMENT AND THE PLAN.   THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN.   THE TRANSMISSION OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF. AFTER THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN WILL BE MATERIALLY ACCURATE, OR (B) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "*SEC*"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.    THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE PLAN DEBTORS WITH "ADEQUATE INFORMATION" (AS DEFINED IN THE BANKRUPTCY CODE) SO THAT THEY CAN MAKE AN INFORMED JUDGMENT ABOUT THE PLAN.   PERSONS OR ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING, SECURITIES OF THE PLAN DEBTORS

SHOULD NOT RELY UPON THIS DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, AS A STIPULATION OR AS A WAIVER, BUT, RATHER, AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THE DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE PLAN DEBTORS OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE LIQUIDATION OR THE PLAN ON HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE PLAN DEBTORS.

**PARTIES SHOULD CONSULT WITH THEIR OWN COUNSEL, ACCOUNTANTS, AND/OR TAX ADVISERS WITH RESPECT TO THE LEGAL EFFECTS AND OTHER CONSEQUENCES OF THE PLAN.**

# TABLE OF CONTENTS

**Page**

I.      PURPOSE AND FUNCTION OF THIS DISCLOSURE STATEMENT.........................1

II.     SHORT SUMMARY OF THE PLAN ..............................................................................1

III.    SOLICITATION AND VOTING PROCEDURES.............................................................5

    A.    CHAPTER 11 GENERALLY .......................................................................5
    B.    SOLICITATION OF ACCEPTANCES OF THE PLAN .........................................6
    C.    VOTING ON THE PLAN ............................................................................6
    D.    OTHER GENERAL INFORMATION ..............................................................9

IV.     GENERAL INFORMATION REGARDING THE PLAN DEBTORS  AND
    EVENTS LEADING TO THE COMMENCEMENT OF THE CASES.........................10

    A.    THE PLAN DEBTORS' BUSINESS AND CORPORATE STRUCTURE ..............10
    B.    THE PLAN DEBTORS' CAPITAL STRUCTURE............................................10
    C.    EVENTS LEADING TO CHAPTER 11 FILINGS.............................................15
    D.    THE PLAN DEBTORS' RESTRUCTURING EFFORTS.....................................15
    E.    THE PROPOSED SALE OF SUBSTANTIALLY ALL OF THE PLAN DEBTORS'
    ASSETS ...............................................................................................17
    F.    SIGNIFICANT EVENTS DURING THE CASES .............................................18

V.      THE PLAN ................................................................................................................23

    A.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS.............23
    B.    DISPUTED CLAIMS AND INTERESTS ......................................................27
    C.    MEANS FOR IMPLEMENTATION OF THE PLAN .........................................27
    D.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.................................30
    E.    DELIVERY OF DISTRIBUTIONS; UNDELIVERABLE DISTRIBUTIONS; W-9
    FORMS .................................................................................................32
    F.    RETENTION OF JURISDICTION.................................................................33
    G.    INJUNCTION, RELEASES AND EXCULPATION ...........................................36

VI.     CONFIRMATION AND CONSUMMATION PROCEDURE .......................................40

    A.    DISCLOSURE AND SOLICITATION ...........................................................40
    B.    ACCEPTANCE OF THE PLAN....................................................................40
    C.    CLASSIFICATION ...................................................................................40
    D.    CONFIRMATION.....................................................................................40

VII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES........................................42

    A.    FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.............................42

VIII.   CERTAIN RISK FACTORS AND OTHER CONSIDERATIONS ................................43

# TABLE OF CONTENTS

**Page**

    A.     Parties in Interest May Object to the Plan Debtors' Classification of Claims and Interests ............................................................43

    B.     Failure to Satisfy Vote Requirements ............................................43

    C.     Plan Debtors May Not Be Able to Secure Confirmation of the Plan......................................................................................................44

    D.     Nonconsensual Confirmation ........................................................44

    E.     Plan Debtors May Object to the Amount or Classification of a Claim...................................................................................................45

    F.     Risk of Non-Occurrence of the Effective Date ...........................45

    G.     Contingencies Will Not Affect Votes to Accept or Reject the Plan......................................................................................................45

    H.     Forward Looking Statements in this Disclosure Statement May Prove to be Inaccurate ....................................................................45

IX.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN .......................................................................................................46

    A.     Liquidation Under Chapter 7 ........................................................46

    B.     Alternative Plan(s) of Reorganization..........................................47

    C.     Recommendation.............................................................................47

X.    CONCLUSION.............................................................................................48

## TABLE OF CONTENTS

**Page**

**EXHIBIT**

Exhibit A            Second Amended Joint Plan of Liquidation of Canal Corporation and Certain of its Affiliated Debtors

## I.  PURPOSE AND FUNCTION OF THIS DISCLOSURE STATEMENT

This Disclosure Statement is submitted by the Plan Debtors, which are the proponents of the Plan.  **The Plan Debtors are all of the Debtors except WTM I Company**.  The purpose of the Disclosure Statement is to provide Holders of Claims and other parties in interest who are entitled to vote on the Plan with sufficient information to enable them to make an informed decision as to whether to vote to accept or reject the Plan.  The purpose of the Plan is to effect a restructuring of the Plan Debtors' liabilities in a manner that will maximize recoveries by Holders of Allowed Claims.  **Defined terms used, but not defined in this Disclosure Statement, shall have the meanings ascribed to such terms in the Plan.  Accordingly, please refer to the Plan for definitions of certain important terms used in this Disclosure Statement.**

This Disclosure Statement:

- Summarizes the Plan and the proposed treatment of Holders of Claims and Holders of Interests under the Plan (Section V, *The Plan*);

- Describes the procedures for soliciting and casting votes on and confirming the Plan (Section III, *Solicitation and Voting Procedures*);

- Describes the background and events leading to the Plan Debtors' decision to commence the Cases (Section IV, *General Information Regarding the Plan Debtors and Events Leading to the Commencement of the Cases*);

- Describes the Plan Debtors' capital structure (Section IV.B, *The Plan Debtors' Capital Structure*);

- Describes the significant events that have occurred during the Cases (Section IV.F, *Significant Events During the Cases*);

- Describes the means for implementing the Plan (Section V.C, *Means for Implementation of the Plan*);

- Projects the total percentage recovery that each Class of Allowed Claims and Interests is likely to receive (Section II, *Short Summary of the Plan*); and

- Evaluates liquidation under chapter 7 of the Bankruptcy Code as an alternative to the Plan (Section IX.A, *Liquidation Under Chapter 7*).

## II.  SHORT SUMMARY OF THE PLAN

The Plan provides for:

- The retention of the Assets by the Plan Debtors and the liquidation and Distribution of the Assets by the Plan Debtors;

- The appointment of the Plan Administrator;

- The payment of Allowed Administrative, Professional Fee and Priority Tax Claims;

- The payment of Allowed Priority Non-Tax Claims;

- The satisfaction of Allowed Secured Claims;

- Distributions for the IRS Settlement Claim;

- Distributions for Allowed General Unsecured Claims;

- The cancellation of the Intercompany Claims in connection with the substantive consolidation of the Plan Debtors; and

- The cancellation of all outstanding Interests in the Plan Debtors.

The following table briefly summarizes the treatment of Allowed Claims and Interests and the provisions of the Plan.  For a more detailed description of the terms and provisions of the Plan, see <u>Section V</u> below.

In accordance with Bankruptcy Code § 1123(a)(1), Administrative Claims and Priority Tax Claims have not been classified under the Plan.  Similarly, Professional Fee Claims are not classified under the Plan.   <u>Section V.A.1</u> below describes the treatment of such Unclassified Claims.

**THE ULTIMATE AMOUNT OF ALLOWED CLAIMS IN EACH CLASS IS SUBJECT TO THE CLAIMS RESOLUTION PROCESS.  ACCORDINGLY, THE AMOUNT OF ALLOWED CLAIMS IN EACH CLASS MAY DIFFER SUBSTANTIALLY AND MATERIALLY FROM THE ESTIMATED AMOUNTS OF ALLOWED CLAIMS SET FORTH IN THE TABLE BELOW.  THE ESTIMATED AMOUNTS OF ALLOWED CLAIMS SET FORTH IN THE TABLE BELOW IN NO WAY BIND THE PLAN DEBTORS OR LIMIT THE ABILITY OF THE PLAN DEBTORS TO OBJECT TO CLAIMS AS SET FORTH IN THE PLAN.**

**THE ESTIMATED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE SUBJECT TO CHANGE.  THE RECOVERIES TO HOLDERS OF ALLOWED CLAIMS MAY DIFFER SUBSTANTIALLY AND MATERIALLY FROM THE ESTIMATED RECOVERIES SET FORTH IN THE BELOW TABLE BASED ON, AMONG OTHER THINGS, THE CASH AVAILABLE TO BE DISTRIBUTED TO HOLDERS OF ALLOWED CLAIMS AND THE AMOUNT OF ALLOWED CLAIMS IN EACH CLASS.**

| *Class* | *Treatment Under the Plan and Entitlement to Vote* | *Estimated Allowed Claims* | *Estimated Recovery[2]* |
|---|---|---|---|
| **Class 1**<br><br>**Priority Non-Tax Claims** | Unimpaired; Not entitled to Vote; Allowed Class 1 Claims will be paid in full in cash or receive such other, less favorable treatment as is agreed upon by the Plan Debtors and the Holder of such Allowed Class 1 Claim. | $0 | 100% |
| **Class 2**<br><br>**Secured Claims** | Unimpaired; Not entitled to Vote; Allowed Class 2 Claims (i) will be reinstated; or (ii) will (a) be paid in full in cash, (b) receive the collateral for such Allowed Class 2 Claim or (c) receive such other, less favorable treatment as is agreed upon by the Plan Debtors and the Holder of such Allowed Class 2 Claim. | $0 | 100% |
| **Class 3A**<br><br>**Other General Unsecured Claims** | Impaired; Entitled to Vote; Holders of Allowed Class 3A Claims will receive their Ratable Amount of the Class 3A Portion of the General Unsecured Distribution Pool. | $200,000,000 | 0.38% |

---

[2]    The estimated recovery percentages do not include the proceeds from Causes of Action because their value, if any, is unknown and unpredictable.

| Class | Treatment Under the Plan and Entitlement to Vote | Estimated Allowed Claims | Estimated Recovery[2] |
|---|---|---|---|
| **Class 3B**<br>**Revenue Bond Claims** | Impaired; Entitled to Vote; Holders of Allowed Class 3B Claims will receive their Ratable Amount of both (i) the Class 3B Portion of the General Unsecured Distribution Pool; and (ii) the Class 3C Portion of the General Unsecured Distribution Pool. | $50,000,000 | 2.28% |
| **Class 3C**<br>**Subordinated Note Claims** | Impaired; Entitled to Vote; Holders of Allowed Class 3C Claims will be deemed to have received their Ratable Amount of the Class 3C Portion of the General Unsecured Distribution Pool and immediately upon the receipt thereof to have transferred such Ratable Amount to the Holders of Allowed Class 3B Claims in accordance with the contractual subordination provisions in the documents under which the Subordinated Note Claims arise and section 510(a) of the Bankruptcy Code. | $250,000,000 | 0%[3] |
| **Class 4**<br>**IRS Settlement Claim** | Impaired; Entitled to Vote; the Holder of the Class 4 Claim will receive Distributions in accordance with the IRS Settlement Agreement. | N/A | N/A |

---

[3]    The estimated recovery percentage for Class 3C identifies the estimated recovery percentage to Holders of Allowed Class 3C Claims after transferring the Class 3C Portion of the General Unsecured Distribution Pool to Holders of Allowed Class 3B Claims.

| *Class* | *Treatment Under the Plan and Entitlement to Vote* | *Estimated Allowed Claims* | *Estimated Recovery[2]* |
|---|---|---|---|
| **Class 5** **Intercompany Claims** | Impaired; Not entitled to Vote; in connection with the substantive consolidation of the Plan Debtors, the Intercompany Claims shall be deemed eliminated, and Holders of Class 5 Claims shall not receive any property under the Plan and are deemed to have voted to reject the Plan. | N/A | 0% |
| **Class 6** **Interests** | Impaired; Not entitled to Vote; Class 6 will not receive any property under the Plan and is deemed to have voted to reject the Plan. | N/A | 0% |

## III.  SOLICITATION AND VOTING PROCEDURES

**A.        Chapter 11 Generally**

Under chapter 11 of the Bankruptcy Code, a debtor is authorized to take certain actions to reorganize or sell its business for the benefit of its creditors, shareholders and other parties in interest.  The confirmation and consummation of a plan of reorganization or liquidation is the objective of a chapter 11 reorganization case.  A plan sets forth the means for satisfying claims against, and interests in, a debtor, and is implemented only after it has been confirmed by the Bankruptcy Court.  Confirmation of a plan by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity security holder of the debtor.

Generally, the holders of claims against or interests in a debtor that are classified under the plan are permitted to vote to accept or reject the Plan.  For the Bankruptcy Court to confirm a plan, the plan must be accepted by at least one class of creditors whose interests or rights are impaired under the plan.  The Bankruptcy Code provides that a plan has been accepted by a class of claimants if holders of at least two-thirds in dollar amount and more than one-half in number of the allowed claims of that class who vote have voted in favor of the plan.

**ONLY THE VOTES OF HOLDERS WHO SUBMIT PROPERLY COMPLETED BALLOTS VOTING FOR OR AGAINST THE PLAN WILL BE COUNTED FOR PURPOSES OF DETERMINING WHETHER THE REQUISITE ACCEPTANCES OF THE CLASSES OF CLAIMS AND INTERESTS HAVE BEEN RECEIVED.  FAILURE BY A HOLDER TO DELIVER A DULY SIGNED BALLOT WILL CONSTITUTE AN ABSTENTION BY THAT HOLDER WITH RESPECT TO THE VOTE ON THE PLAN. ABSTENTIONS WILL NOT BE COUNTED AS VOTES TO ACCEPT OR REJECT THE**

**PLAN AND THEREFORE WILL HAVE NO EFFECT.  FURTHERMORE, THE PLAN DEBTORS RESERVE THE RIGHT PRIOR TO CONFIRMATION OF THE PLAN TO SEEK TO HAVE ANY PARTY'S VOTE ESTIMATED SOLELY FOR PURPOSES OF COUNTING SUCH VOTE IN ACCORDANCE WITH BANKRUPTCY RULE 3018.**

The Bankruptcy Code also requires that the solicitation of acceptances of the proposed plan must be accompanied by a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.  That is the purpose of this Disclosure Statement.

The Plan provides for specified distributions to the various Classes of Holders of Claims and Interests, which are described in detail herein.  The Plan Debtors believe that the Plan provides consideration to all Classes of Claims and Interests that reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual subordination) of those Claims and Interests.  In addition to the voting requirements discussed above, the Bankruptcy Court must find that various statutory tests are met before it may confirm the Plan.  Many of these tests are designed to protect the interests of Holders of Claims or Interests who do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed.

**B.        Solicitation of Acceptances of the Plan**

Under the Plan, all Claims and Interests have been categorized based on the nature and priority of the Claim or Interest by placing Claims and Interests in Classes and by categorizing certain Claims as Unclassified Claims.  Each Claim or Interest is either impaired or unimpaired under the Plan, as such terms are defined in section 1124 of the Bankruptcy Code.  A Class of Claims or Interests that is unimpaired is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, accordingly, is not entitled to vote on the Plan.  Similarly, a Class of Claims or Interests that does not receive or retain any property under the Plan is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, likewise, is not entitled to vote.  Accordingly, acceptances of the Plan are being solicited only from Holders of Claims in impaired Classes that are to receive Distributions under the Plan.  The only such Classes are Classes 3A, 3B, 3C and 4.  As discussed above, for impaired Classes, section 1126 of the Bankruptcy Code provides that an impaired Class of Claims or Interests is deemed to accept the Plan if Holders of at least two-thirds in dollar amount and a majority in number of the Claims who cast Ballots vote to accept the Plan.

Only those Holders who vote to accept or reject the Plan will be counted for purposes of determining whether the Plan is accepted or rejected.  Therefore, the Plan could be accepted by any impaired Class of Claims with the affirmative vote of significantly less than two-thirds in dollar amount and a majority in number of the Claims in a Class.

**C.        Voting on the Plan**

The Bankruptcy Court set ***March 22, 2011*** as the deadline for casting Ballots approving or rejecting the Plan (the "*Ballot Deadline*").

1.        Who May Vote

Only Holders of Claims in Classes that are impaired are eligible to vote on the Plan. Accordingly, only Holders of Claims in Classes 3A, 3B, 3C and 4 are eligible to vote.

2.        Voting Deadline and Extensions

---

**The Ballot Deadline is _MARCH 22, 2011_.   You must return your completed Ballot to Canal Corporation (f/k/a Chesapeake Corporation) Ballots, c/o Kurtzman Carson Consultants, 2335 Alaska Ave., El Segundo, CA 90245, so that it is actually received by 5:00 p.m., prevailing Pacific Time, on the Ballot Deadline.**

---

To be counted for purposes of voting on the Plan, all of the information requested on the applicable Ballot must be provided.  The Plan Debtors reserve the right, in their sole discretion, to extend the Ballot Deadline, in which case the term "Ballot Deadline" will mean the latest date on which a Ballot will be accepted.  To extend the Ballot Deadline, the Plan Debtors will notify you of any extension by oral or written notice and as promptly as practicable mail written notice thereof to each record Holder of Claims entitled to vote.  The notice may state that the Plan Debtors are extending the Ballot Deadline for a specified period of time or on a daily basis until 5:00 p.m., Pacific Time, on the date on which the Plan Debtors have received sufficient acceptances to seek confirmation of the Plan.

3.        Voting Procedures

An appropriate Ballot is enclosed in the solicitation package included with this Disclosure Statement.  All votes to accept or reject the Plan must be cast by using that Ballot. Votes that are cast in any manner other than on the designated Ballot will not be counted. Ballots must be actually received by Kurtzman Carson Consultants, LLC (the "_Ballot Agent_"), at the address indicated on the Ballot, by no later than 5:00 p.m., Pacific Time, on the Ballot Deadline.

If you elect to vote on the Plan, you should complete and sign the Ballot in accordance with the instructions thereon, being sure to fill in the amount of your Claim in the appropriate space provided and check the appropriate box entitled "Accept the Plan" or "Reject the Plan." You may not split your vote on the Plan with respect to a particular Class.

In the event that a Ballot is properly executed, but leaves the amount of the Claim blank, the aggregate amount of the Claim for voting purposes will be the amount shown on the Plan Debtors' books and records, unless otherwise ordered by the Bankruptcy Court.  If the aggregate amount of the Claims filled in on your Ballot exceeds the amount indicated by the Plan Debtors' books and records and listed in the Plan Debtors' schedules, the Plan Debtors reserve the right to seek an order of the Bankruptcy Court determining the proper amount of your Claims for voting purposes pursuant to Rule 3018 of the Bankruptcy Rules.  Failure of a Holder to deliver a duly signed Ballot will constitute an abstention by that Holder with respect to a vote on the Plan.

Abstentions will not be counted as either acceptances or rejections of the Plan. Because abstentions will have no effect on voting with respect to the Plan, it is extremely important that you timely return your Ballot to indicate whether you accept or reject the Plan.

Submission of all Ballots must be made directly to the Ballot Agent in accordance with the instructions on the Ballots. In all cases, sufficient time should be allowed to assure timely delivery. You may receive multiple solicitation packages. You should only vote one Ballot for each Class of which you are a member.

4. ***<u>Releases</u>***

***As set forth in <u>Section V</u> below, except as otherwise specifically provided in the Plan, on and after the Effective Date, Holders of Claims (a) voting to accept the Plan or (b) abstaining from voting on the Plan and electing not to opt out of the release contained in <u>Section 9.5</u> of the Plan (which by definition does not include Holders of Claims or Interests who are not entitled to receive anything and thus are deemed to have voted against the Plan), shall be deemed to have granted the release contained in <u>Section 9.5</u> of the Plan. Holders of Claims voting against the Plan shall be deemed to have rejected the release contained in <u>Section 9.5</u> of the Plan.***

If you have questions concerning the procedure for voting, the option to abstain from voting on the Plan and to elect to opt out of the release, or the terms of this Disclosure Statement and/or the Plan, please contact counsel for the Plan Debtors indicated on the first page of this Disclosure Statement. If you did not receive the appropriate Ballot or Ballots, or if you received a damaged Ballot or have lost your Ballot, please contact the Ballot Agent.

5. <u>Withdrawal of Votes on the Plan</u>

The solicitation of acceptances of the Plan will expire on the Ballot Deadline. A properly submitted Ballot may be withdrawn by delivering a written notice of withdrawal to the Ballot Agent at its address set forth on the Ballot at any time prior to the Ballot Deadline. Thereafter, withdrawal may be effected only with the approval of the Bankruptcy Court, pursuant to Rule 3018(a) of the Bankruptcy Rules.

To be valid, a notice of withdrawal must:

- specify the name of the Holder who submitted the votes on the Plan to be withdrawn;

- contain the description of the Claim; and

- be signed by the Holder in the same manner as on the Ballot.

The Plan Debtors expressly reserve the right to contest the timeliness or validity of any withdrawals of votes on the Plan.

In addition to withdrawal as specified above, any Holder who has previously submitted a properly completed Ballot may revoke and change its vote by submitting to the Ballot Agent prior to the Ballot Deadline a subsequent properly completed Ballot.  If more than one timely, properly completed Ballot is received, only the Ballot that bears the latest date will be counted.

**D.        Other General Information**

**THE PLAN DEBTORS BELIEVE THAT THE PLAN PROVIDES EQUAL OR GREATER VALUE TO HOLDERS OF ALLOWED CLAIMS THAN OTHER AVAILABLE ALTERNATIVES, AS DISCUSSED IN FURTHER DETAIL IN <u>SECTION IX</u>, *ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN*. THE PLAN DEBTORS BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF EACH AND EVERY CLASS ENTITLED TO VOTE ON THE PLAN AND RECOMMEND THAT EACH HOLDER OF CLAIMS IN SUCH CLASSES VOTE TO ACCEPT THE PLAN.   THIS DISCLOSURE STATEMENT CONTAINS GOOD FAITH ESTIMATES AND ASSUMPTIONS WHICH ARE BASED ON FACTS CURRENTLY KNOWN TO THE APPLICABLE PLAN DEBTORS AND WHICH MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.**

**EACH    HOLDER   OF   CLAIMS   SHOULD   READ   THIS   DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY AND CONSULT WITH ITS LEGAL AND/OR BUSINESS ADVISORS AS IT DEEMS APPROPRIATE BEFORE VOTING ON THE PLAN.    THIS DISCLOSURE STATEMENT IS NOT LEGAL ADVICE TO YOU.  THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.    THIS  DISCLOSURE  STATEMENT  IS  NOT  INTENDED  TO  REPLACE CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN BY EACH HOLDER OF A CLAIM ENTITLED TO VOTE THEREON, BUT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW.  THE DESCRIPTION OF THE PLAN SET FORTH HEREIN IS ONLY A SUMMARY, AND HOLDERS OF CLAIMS AND INTERESTS, AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN THEMSELVES FOR A FULL UNDERSTANDING OF THE PLAN.  IF ANY INCONSISTENCY  EXISTS  BETWEEN  THE  PLAN  AND  THIS  DISCLOSURE STATEMENT, THE TERMS OF THE PLAN CONTROL.**

General information regarding the Plan Debtors, their businesses and material events leading to their commencement of the Cases and the proposal of the Plan is set forth in <u>Section IV</u>.  Except where otherwise noted, this information is provided by the Plan Debtors.

**THE STATEMENTS AS TO THE APPLICABLE PLAN DEBTOR'S FINANCIAL CONDITION CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF NOVEMBER 30, 2010 (UNLESS ANOTHER TIME IS SPECIFIED), AND THERE IS NO REPRESENTATION OR IMPLICATION THAT THE INFORMATION CONTAINED HEREIN WILL NOT HAVE CHANGED AS OF ANY TIME SUBSEQUENT TO THAT DATE, NOR WILL YOU RECEIVE ANY NOTICE OF SUCH CHANGES.**

Certain risk factors and other considerations are described in <u>Section VIII</u> below. Alternatives to confirmation and consummation of the Plan are described in <u>Section IX</u>  below.

**THIS DISCLOSURE STATEMENT INCLUDES CERTAIN STATEMENTS, ESTIMATES AND PROJECTIONS PROVIDED BY THE APPLICABLE PLAN DEBTORS AS TO CERTAIN FUTURE MATTERS THAT REFLECT VARIOUS ASSUMPTIONS, WHICH ASSUMPTIONS MAY OR MAY NOT PROVE TO BE CORRECT.  THE PLAN DEBTORS DO NOT UNDERTAKE ANY OBLIGATION TO PROVIDE ADDITIONAL INFORMATION OR TO CORRECT OR UPDATE ANY OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT OR THE EXHIBIT HERETO.**

## IV.  GENERAL INFORMATION REGARDING THE PLAN DEBTORS AND EVENTS LEADING TO THE COMMENCEMENT OF THE CASES

**A.        The Plan Debtors' Business and Corporate Structure**

Canal Corporation (f/k/a Chesapeake Corporation) ("*Canal Corporation*") is a Virginia corporation that was founded in 1918.  Canal Corporation originally operated a kraft pulp and paper mill in West Point, Virginia.  Through the years, it expanded into several commodity paper products, forest products and corrugated packaging operations located primarily in the United States.  Beginning with the sale of its West Point pulp and paper mill in 1997, Canal Corporation divested its commodity paper products, forest products and corrugated packaging businesses, and invested the sale proceeds in several acquisitions that transformed Canal Corporation into a value-added paperboard and plastic packaging products business.

As of the Petition Date, Canal Corporation, through its Plan Debtor subsidiaries and non-Plan Debtor subsidiaries (collectively, the "*Subsidiaries*"; and together with Canal Corporation, the "*Company*") located throughout Europe and in North America, Africa and Asia, was a supplier of specialty paperboard packaging products and an international supplier of plastic packaging products to niche end-use markets.  As of the Petition Date, the Company operated in two core business segments:  "Paperboard Packaging" and "Plastic Packaging."

*Paperboard Packaging*.  As of the Petition Date, the Company's Paperboard Packaging segment designed and manufactured folding cartons, spirally wound composite tubes, leaflets, labels and other paper and paperboard packaging products.  The primary end-use markets for this segment were pharmaceutical, healthcare and branded products.

*Plastic Packaging*.  As of the Petition Date, the Company's Plastic Packaging segment designed and manufactured plastic containers, bottles, and preforms designed in-house or from designs supplied by customers.   The primary end-use markets for this segment were agrochemicals, other specialty chemicals and food and beverages.

**B.        The Plan Debtors' Capital Structure**

(i)        Common Stock

Canal Corporation's common stock historically was listed on the New York Stock Exchange (the "*NYSE*"), beginning in 1944, under the trading symbol "CSK." The NYSE suspended the listing of Canal Corporation's common stock effective October 8, 2008, due to Canal Corporation's inability to meet the global market capitalization requirements for continued listing on the exchange. Subsequently, Canal Corporation's stock began to be quoted on the over-the-counter bulletin board under the trading symbol "CSKE.PK." As of December 26, 2008, Canal Corporation had 20,559,115 shares of common stock outstanding, with par value of $1.00 per share. As of the Petition Date, there were approximately 4,000 separate registered holders of record and approximately 4,500 unregistered beneficial owners of Canal Corporation's common stock.

As of the Petition Date, Canal Corporation (a) directly owned 100% of each of the other Plan Debtors; and (b) owned, directly or indirectly, 100% of each of the non-Plan Debtor Subsidiaries except for (i) Chesapeake Plastics Kft, a Hungarian joint venture which was 49% owned by Chemark Kft; and (ii) Rotam Boxmore Packaging Co. Ltd., a British Virgin Islands company which was 50% owned by Canada Rotam International Co. Ltd.

(ii)    Prepetition Credit Agreement

On February 23, 2004, Canal Corporation and certain of the Subsidiaries entered into that certain Second Amended and Restated Credit Agreement (as amended, the "*Prepetition Credit Agreement*"; together with the related credit documents, the "*Prepetition Loan Documents*"), by and among Canal Corporation, as the U.S. borrower, Chesapeake UK Acquisitions plc ("*Acquisitions*"), Chesapeake U.K. Holdings Limited ("*UK Holdings*"), Boxmore International Limited ("*Boxmore*") and Chesapeake plc (f/k/a Field Group plc) ("*Chesapeake PLC*"), as the U.K. borrowers, the various financial institutions and other persons from time to time parties thereto, as the lenders (the "*Prepetition Lenders*"), Wachovia Bank, N.A., as administrative agent (the "*Prepetition Administrative Agent*"; together with the Prepetition Lenders, the "*Prepetition Secured Parties*"), Bank of America, N.A. and Citicorp North America, Inc., as syndication agents, HSBC Bank plc, as documentation agent, Wachovia Capital Markets, LLC, as a co-lead arranger and sole book runner, and Banc of America Securities LLC and Citicorp North America, Inc., as co-lead arrangers. In its original form, the Prepetition Credit Agreement allowed the Company to borrow and guaranty loan balances up to $250 million.

The Prepetition Credit Agreement was secured by a pledge of owned real property, inventory, equipment, receivables, intellectual property, collateral accounts, investment property (including capital securities held by Canal Corporation), books and records and proceeds of the foregoing of Canal Corporation and the U.S. Subsidiaries. The Prepetition Credit Agreement was guaranteed by substantially all U.S., U.K. and European Subsidiaries, although the U.K. Subsidiaries only guaranteed borrowings made by other U.K. Subsidiaries and certain of the European Subsidiaries' guaranties were subject to other limitations. Certain obligations of the obligors under the Prepetition Credit Agreement were collateralized by a pledge of the stock and substantially all of the assets of the material U.K. and other European Subsidiaries.

As of the Petition Date, the Prepetition Credit Agreement was scheduled to mature in February 2009. As of the Petition Date, the Plan Debtors were indebted to the Prepetition

Secured Parties in the aggregate principal amount of approximately $245,984,567, plus accrued and unpaid interest thereon and costs and expenses including, without limitation, attorneys' fees, agent's fees, other professional fees and disbursements and other obligations owing under the Prepetition Loan Documents.

(iii)    Revenue Bonds

On March 1, 1994, Canal Corporation entered into (a) that certain Loan Agreement, by and among Canal Corporation, the Industrial Development Authority of the Town of West Point, Virginia and NationsBank of Virginia, N.A., as trustee, relating to $18,750,000 Solid Waste Disposal Revenue Bonds, Series 1994A (the "*Series A Bonds*"), and (b) that certain Loan Agreement, by and among Canal Corporation, the Industrial Development Authority of the Town of West Point, Virginia and NationsBank of Virginia, N.A., as trustee, relating to $31,250,000 Solid Waste Disposal Revenue Refunding Bonds, Series 1994B (the "*Series B Bonds*"). Each of the Series A Bonds and the Series B Bonds was issued under a separate Indenture of Trust, dated as of March 1, 1994, between the Industrial Development Authority of the Town of West Point, Virginia and NationsBank of Virginia, N.A., as trustee. Canal Corporation was loaned the proceeds of the Series A Bonds and the Series B Bonds (collectively, the "*Revenue Bonds*") and agreed to repay the loans by making payments sufficient to pay when due the principal and interest on the Revenue Bonds.

The Revenue Bonds are unsecured obligations of Canal Corporation and rank equally in right of payment with all other unsecured and unsubordinated indebtedness. The Revenue Bonds rank senior in right of payment to the Subordinated Notes (as defined below). As of November 30, 2008, the principal amount outstanding under the Revenue Bonds totaled $50,000,000, together with approximately $847,656 in accrued, but unpaid, interest.

(iv)    2011 Subordinated Notes

In 2001, Canal Corporation completed an offering of £115,000,000 of Senior Subordinated Notes (the "*2011 Subordinated Notes*") due in 2011, that bear interest at 10-3/8% per annum. In connection with the offering, Canal Corporation entered into that certain Indenture, dated as of November 19, 2001, by and between Canal Corporation and U.S. Bank National Association (successor to The Bank of New York), as trustee. As of the Petition Date, the 2011 Subordinated Notes were listed on the Luxembourg Stock Exchange.

The 2011 Subordinated Notes are unsecured subordinated obligations of Canal Corporation, subordinated in right of payment to all existing and future senior indebtedness (as defined in the 2011 Subordinated Notes and related documents). The 2011 Subordinated Notes rank junior in right of payment to obligations under the Prepetition Credit Agreement, the Revenue Bonds and any other senior indebtedness. As of November 30, 2008, the principal amount outstanding under the 2011 Subordinated Notes totaled £67,090,000, together with approximately £3,748,009 in accrued, but unpaid, interest.

(v)      2014 Subordinated Notes

In 2004, Canal Corporation completed an offering of €100,000,000 of Senior Subordinated Notes (the "*2014 Subordinated Notes*"; together with the 2011 Subordinated Notes, the "*Subordinated Notes*") due in 2014, that bear interest at 7% per annum.  In connection with the offering, Canal Corporation entered into that certain Indenture, dated as of December 8, 2004, by and between Canal Corporation and U.S. Bank National Association (successor to Wachovia Bank, N.A.), as trustee.  As of the Petition Date, the 2014 Subordinated Notes were listed on the Luxembourg Stock Exchange.

The 2014 Subordinated Notes are unsecured subordinated obligations of Canal Corporation, subordinated in right of payment to all existing and future senior indebtedness (as defined in the 2014 Subordinated Notes and related documents).  The 2014 Subordinated Notes rank junior in right of payment to obligations under the Prepetition Credit Agreement, the Revenue Bonds and any other senior indebtedness.  As of November 30, 2008, the principal amount outstanding under the 2014 Subordinated Bonds totaled €100,000,000, together with approximately €3,230,769 in accrued, but unpaid, interest.

(vi)     Other General Unsecured Claims

a.      Trade Creditors

As of the Petition Date, the Plan Debtors incurred approximately $3,000,000 per month of unsecured obligations owed to various trade creditors.

b.      Employees

As of the Petition Date, the Plan Debtors incurred approximately $1,741,912 per month of average gross monthly payroll.  As of the Petition Date, in addition to amounts owed for wages and salary, the Plan Debtors also incurred obligations to employees for other forms of compensation, including vacation pay, paid sick time and other earned time off, reimbursement of certain business expenses, certain matching contributions to 401(k) plans, health benefits and other miscellaneous benefits.  Moreover, as of the Petition Date the Plan Debtors had obligations to certain employees in connection with individual employee contracts, the Plan Debtors' severance plans and the Plan Debtors' executive supplemental retirement plan.

c.      Retiree Issues

As of the Petition Date, State Street managed the trust for Canal Corporation's defined benefit retirement plan (the "*Pension Plan*").  The obligations under the Pension Plan were frozen as of December 31, 2005, for all employees, except for certain former employees on long-term disability who continued to accrue benefits.  As of June 30, 2008, only two such long-term disability former employees continued to accrue benefits under the Pension Plan.  The Pension Plan is covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1301-1461 ("*ERISA*").  As of the Petition Date, Canal Corporation may have had obligations to the Pension Benefit Guarantee Corporation (the "*PBGC*") in connection with the Pension Plan.

13

As of the Petition Date, Frank Russell Company managed the trust that was a funding mechanism for the payment of benefits under certain employee welfare benefit plans, including the post-retirement participating plan (the "*Post-Retirement Participating Plan*").  The trust complies with ERISA and constitutes a voluntary employees beneficiary association under section 501(c)(9) of the Internal Revenue Code (the "*VEBA Trust*").  Prior to the Petition Date, and thereafter, the VEBA Trust paid insurance premiums for beneficiaries under the Post-Retirement Participating Plan.  Although the VEBA Trust paid the entire amount of such premiums, the Post-Retirement Participating Plan required certain of the beneficiaries to pay a portion of such premiums (the "*Premium Contributions*").  From 2006 through July 2009, these beneficiaries paid the Premium Contributions to Canal Corporation, and Canal Corporation did not forward the Premium Contributions to the VEBA Trust.  As of the Petition Date, Canal Corporation may have had obligations to the VEBA Trust in connection with the Premium Contributions.

As of the Petition Date, twenty-four (24) former employees received monthly benefits of a total of $40,000 under a supplemental executive retirement plan (the "*SERP*").  In addition, as of the Petition Date two (2) former employees received annual benefits of $53,000 and $124,000, respectively, under the SERP.  As of the Petition Date, Canal Corporation may have had unsecured obligations to certain of Canal Corporation's employees and former employees under the SERP.

As of the Petition Date, four former outside directors received quarterly benefits of $7,162.50 each, for a total of $28,650 total per quarter, under Canal Corporation's outside director retirement plan.  This plan was frozen in 1997 and directors who have taken office since 1997 are not eligible to participate in the plan.  As of the Petition Date, Canal Corporation may have had unsecured obligations to certain of Canal Corporation's directors and former directors under Canal Corporation's outside director retirement plan.

As of the Petition Date, Canal Corporation offered a 401(k) restoration plan to certain employees which allowed such employees to defer part of their compensation.  As of the Petition Date, Canal Corporation may have had unsecured obligations to employees or former employees under such plan.

As of the Petition Date, Canal Corporation offered a nonqualified deferred compensation plan to certain employees which allowed such employees to defer some of their incentive awards.  As of the Petition Date, Canal Corporation may have had unsecured obligations under such plan.  In addition, as of the Petition Date Canal Corporation offered a non-qualified deferred compensation plan to non-employee directors which allowed such directors to defer some or all of their retainer, meeting fees or stock fees.  As of the Petition Date, Canal Corporation may have had unsecured obligations under such plan.

        d.        Intercompany Transactions

As of the Petition Date, certain of the Plan Debtors had unsecured obligations to one another.  Further, as of the Petition Date, Canal Corporation had unsecured obligations to certain

of the non-Plan Debtor Subsidiaries and certain of the non-Plan Debtor Subsidiaries had unsecured obligations to Canal Corporation.

e.    Environmental Liabilities

As of the Petition Date, Twentieth Century Refuse Removal Company, Inc. had asserted claims against Canal Corporation and over 300 other defendants and third-party defendants related to the clean-up of the Pennsauken Landfill in Pennsauken, New Jersey.  The contribution claims asserted against Canal Corporation relate to Canal Corporation's former Philadelphia box plant.  As of the Petition Date, the claims asserted against Canal Corporation were in the discovery phase.

**C.    Events Leading to Chapter 11 Filings**

The principal contributing factor to the Plan Debtors' filing for relief under chapter 11 was the Plan Debtors' debt structure described above.  As of the Petition Date, the Plan Debtors had been, and were, significantly levered.  As of the Petition Date, the Plan Debtors had approximately $520,744,903 in non-trade, interest bearing debt, which resulted in annual interest expense of approximately $49,500,000.  As of the Petition Date, the Plan Debtors required access to capital to support the Company's operations; however, the Plan Debtors no longer had access to borrowings or other capital and had determined that they could no longer support their level of debt.

In addition, as of the Petition Date, the overall condition of the economy, aggressive competition in the businesses within which the Company operated and other unforeseen matters generally outside the Plan Debtors' control seriously depleted the Plan Debtors' cash reserves, prevented the Plan Debtors from executing on their business plans, tightened their operating margins and threatened the Plan Debtors' ability to survive as going concerns.  In particular, as of the Petition Date, the Plan Debtors had been materially affected by the conditions in the financial and credit markets.  The volatility and dysfunctions in the financial and credit markets over the year prior to the Petition Date, including the unprecedented events between October 2008 and the Petition Date, exacerbated the Plan Debtors' liquidity problems and complicated the Plan Debtors' efforts to refinance the Prepetition Credit Agreement.

**D.    The Plan Debtors' Restructuring Efforts**

In December 2007, in anticipation of the Prepetition Credit Agreement's February 2009 expiration date, the Plan Debtors started negotiations with GE Commercial Finance Limited and affiliated entities (collectively, "_GE_") regarding the terms of an asset based lending facility that would replace the Prepetition Credit Agreement.  These discussions continued through approximately October 2008.

As a result of certain of the economic and liquidity issues described above, in June 2008, the Plan Debtors began discussions with Goldman Sachs & Co., as their investment banker, to assist the Plan Debtors with, among other things, their efforts to address the scheduled maturity of the Prepetition Credit Agreement in February 2009 and to explore options for non-core or underperforming assets of the Company.

During the spring and early summer of 2008, contemporaneously with their efforts to refinance the Prepetition Credit Agreement, the Plan Debtors continued to pursue options for certain of the Company's non-core or underperforming assets. The Plan Debtors also continued to review the Company's balance sheet and to explore alternatives for reducing leverage and improving their capital structure to better position the Plan Debtors and the non-Plan Debtor Subsidiaries for growth and profitability for the benefit of their stakeholders.

In August 2008, the Plan Debtors continued their restructuring efforts by pursuing a comprehensive refinancing plan which, if it had been consummated, would have included (1) entering into new senior secured credit facilities to be used to fully repay the Prepetition Credit Agreement and to provide incremental liquidity; and (2) conducting an offer to exchange the Subordinated Notes for new debt and equity securities. During this time the Plan Debtors continued to attempt to work with GE as a potential participant in elements of the new senior secured credit facilities.

In August 2008, the holders of more than 70 percent of the principal amount of the Subordinated Notes formed an ad hoc committee (the "*Ad Hoc Committee*") to address, among other things, a potential offer to exchange the Subordinated Notes for new debt and equity securities or a potential offer to purchase substantially all of the Plan Debtors' assets. The Plan Debtors actively engaged in discussions with members of the Ad Hoc Committee about financial restructuring alternatives to address the Plan Debtors' short-term and long-term financing, capital structure and operational needs. Ultimately, these discussions led to the proposed asset purchase agreement (the "*APA*") discussed below.

In October 2008, the Plan Debtors also engaged in negotiations with the Prepetition Administrative Agent for the Prepetition Credit Agreement to address certain financial condition covenants in the Prepetition Credit Agreement. Canal Corporation previously had obtained a waiver of these financial condition covenants through October 31, 2008. Canal Corporation and the Prepetition Administrative Agent entered into a forbearance agreement regarding the Prepetition Credit Agreement dated as of November 1, 2008 (the "*Forbearance Agreement*"). Among other things, the Forbearance Agreement provided that the Prepetition Administrative Agent would forbear from taking certain actions based on the occurrence and continuance of certain financial condition covenant defaults in the Prepetition Credit Agreement until the earlier of December 10, 2008, or the occurrence of a termination event under the Forbearance Agreement (the "*Forbearance Deadline*"). In December 2008, the Plan Debtors again engaged in negotiations with the Prepetition Administrative Agent and entered into the Waiver and Amendment No. 1 to the Forbearance Agreement dated as of December 10, 2008, which extended the Forbearance Deadline to the earlier of December 23, 2008, or the occurrence of a Termination Event under the Forbearance Agreement. Subsequently, the Plan Debtors and the Prepetition Administrative Agent entered into the Waiver and Amendment No. 2 to the Forbearance Agreement dated as of December 23, 2008, which extended the Forbearance Deadline to the earlier of December 30, 2008, or the occurrence of a Termination Event under the Forbearance Agreement.

In addition, during the period from May through December 2008, both Goldman Sachs and the Company discreetly contacted numerous potential purchasers of some or all of the

Company's assets in an effort to maximize the value of those assets. Based on the responses to these sales and marketing efforts and other relevant considerations, the Plan Debtors decided that it was in the best interest of the Plan Debtors, their estates, creditors and other stakeholders to enter into the APA. In particular, the APA or a similar transaction contained the possibility of preserving the jobs of approximately 350 employees of the US Operating Subsidiaries (as defined below) and the jobs of approximately 4,900 employees of the Foreign Subsidiaries (as defined below).

**E.**      **The Proposed Sale of Substantially All of the Plan Debtors' Assets**

In connection with the Plan Debtors' efforts to maximize value for their stakeholders, the Plan Debtors initially engaged in discussions with members of the Ad Hoc Committee and their advisors with respect to the terms of a potential reorganization transaction. Those initial discussions evolved into more detailed discussions with certain members of the Ad Hoc Committee regarding the potential acquisition by that group of substantially all of the Plan Debtors' assets. As a result of these discussions, the Plan Debtors entered into the APA with entities controlled by Irving Place Capital Management, L.P. and Oaktree Capital Management, L.P. (collectively, the "*Stalking Horse Purchasers*") to sell substantially all of the Debtors' assets (the "*Sale*").

Under the APA, the Debtors proposed to sell, *inter alia* (i) substantially all of the operating assets of the Plan Debtors; (ii) the outstanding capital stock or other equity securities of the foreign Subsidiaries (collectively, the "*Foreign Subsidiaries*") owned by the Plan Debtors; and (iii) intercompany obligations of the Foreign Subsidiaries owed to the Plan Debtors, except to the extent the Stalking Horse Purchasers expressly designated any assets as excluded assets (collectively, the "*Acquired Assets*").

In addition, under the APA the Stalking Horse Purchasers proposed to assume, *inter alia* (a) subject to the satisfaction of certain pre-closing covenants and deductions to the purchase price, all obligations of the Foreign Subsidiaries; (b) certain obligations of Plan Debtor Canal NC Company (f/k/a Chesapeake Printing and Packaging Company) ("*Printing*") and Plan Debtor Canal NY Company, Inc. (f/k/a Chesapeake Pharmaceutical Packaging Company, Inc.) ("*Pharmaceutical*"; together with Printing, the "*US Operating Subsidiaries*"); (c) obligations under the contracts to be assigned to the Stalking Horse Purchasers; (d) obligations under certain retention agreements; (e) certain severance obligations of the Company; (f) the sponsorship of certain assumed employee benefit plans; (g) intercompany obligations of any Plan Debtor to any Foreign Subsidiary; and (h) all obligations of the Plan Debtors under the Prepetition Loan Documents and the DIP Financing (as defined below) as of the closing of the Sale.

Accordingly, as a result of the Plan Debtors' liquidity and other problems, the Plan Debtors filed the Cases in order to consummate the APA, or a similar transaction, receive the benefit of the automatic stay provided by chapter 11, and to preserve their assets and to maximize the value of those assets for the benefit of their stakeholders.

**F.        Significant Events During the Cases**

(i)        Payment of Certain Prepetition Obligations

On the Petition Date, the Plan Debtors filed a number of "first day" motions designed to ensure the Plan Debtors' ability to continue to operate with minimal disruption following the filing of the Cases.  Specifically, the Plan Debtors requested authority to pay certain pre-Petition Date obligations, primarily related to outstanding amounts owed to their employees in the ordinary course of business.  In addition, the Plan Debtors requested authority to make certain payments owed to customers and to continue certain customer programs.   The Plan Debtors also requested authority pay certain taxes to the applicable taxing authorities.  On December 30, 2008, the Bankruptcy Court conducted a hearing to consider the first day motions and entered orders authorizing the Debtors, among other things, (i) to make certain payments to employees, (ii) to make certain payments to customers, and (iii) to pay certain taxes to the applicable taxing authorities.

(ii)        DIP Financing

On the Petition Date, the Plan Debtors filed a motion seeking approval of debtor-in-possession financing (the "_DIP Financing_") to be entered into by and among UK Holdings, Boxmore and Chesapeake PLC as borrowers (the "_Borrowers_"), the Plan Debtors and certain Subsidiaries as guarantors (collectively, the "_Guarantors_"), Wachovia Bank, National Association in its capacity as administrative agent, and the banks, financial institutions and other lenders parties thereto, to be comprised of a revolving credit facility of up to $37,100,000 to be made available to the Borrowers and guaranteed by the Plan Debtors and the other Guarantors on a senior secured, super-priority priming basis.  The proceeds of the DIP Financing were used, among other things, to repay intercompany loans owed to Canal Corporation which provided the Plan Debtors with the funds needed to continue their operations as going concerns pending the closing of the Sale.  On December 30, 2010, the Bankruptcy Court entered an interim order approving the DIP Financing, and on February 3, 2009, the Bankruptcy Court entered a final order approving the DIP Financing.

(iii)        Retention of Professionals

a.        Hunton & Williams LLP

To assist them in carrying out their duties as debtors-in-possession, and to represent their interests otherwise in the Cases, the Debtors filed with the Bankruptcy Court an application seeking entry of an order authorizing the Debtors to retain Hunton & Williams LLP as their counsel.  On January 21, 2009, the Bankruptcy Court entered an order approving the application on a final basis.

b.        Hammonds LLP

To assist them in carrying out their duties as debtors-in-possession, and to represent their interests otherwise in the Cases, the Debtors filed with the Bankruptcy Court an application seeking entry of an order authorizing the Debtors to retain Hammonds LLP as special counsel

concerning certain aspects of the proposed Sale, including competition, pensions and European finance aspects. On January 21, 2009, the Bankruptcy Court entered an order approving the application on a final basis.

c.    Tavenner & Beran, PLC

To assist them in carrying out their duties as debtors-in-possession, and to represent their interests otherwise in the Cases, the Debtors filed with the Bankruptcy Court an application seeking entry of an order authorizing the Debtors to retain Tavenner & Beran, PLC as conflicts counsel. On January 21, 2009, the Bankruptcy Court entered an order approving the application on a final basis.

d.    Alvarez & Marsal North America, LLC

The Debtors filed with the Bankruptcy Court an application seeking entry of an order authorizing the Debtors to retain Alvarez & Marsal North America, LLC to provide financial advisory services to the Debtors. On January 21, 2009, the Bankruptcy Court entered an order approving the application on a final basis.

e.    Goldman Sachs & Co.

The Debtors filed with the Bankruptcy Court an application seeking entry of an order authorizing the Debtors to retain Goldman Sachs & Co. to provide financial advisory and investment banking services with respect to the restructuring or sale of the Debtors' assets and liabilities. On January 21, 2009, the Bankruptcy Court entered an order approving the application on a final basis.

(iv)    Official Committee of Unsecured Creditors

On January 2, 2009, the United States Trustee appointed an official committee of unsecured creditors (the "*Committee*"). Pursuant to orders of the Bankruptcy Court, the Committee retained Greenberg Traurig, LLP as its bankruptcy counsel, Lowenstein Sandler PC as its special counsel, and Gordian Group, LLC as its financial advisor.

(v)    The Sale

As discussed above, prior to the Petition Date, the Plan Debtors contemplated a transaction pursuant to which the Plan Debtors would transfer substantially all of their assets. On the Petition Date, the Debtors filed a motion seeking approval of the bid procedures concerning the Sale (the "*Bid Procedures*"), the Sale itself and certain related matters.

On January 20, 2009, the Court entered the order approving the Bid Procedures and certain related matters (the "*Bid Procedures Order*"). After the entry of the Bid Procedures Order, the Plan Debtors complied with the Bid Procedures.

The Plan Debtors did not receive any other offers to purchase substantially all of the Plan Debtors' assets. Accordingly, the Plan Debtors determined in their good faith business judgment

that it was in the best interest of the Plan Debtors, their estates, creditors and other stakeholders to proceed to close the Sale with the Stalking Horse Purchasers pursuant to the APA.

On March 23, 2009, the Court entered the order approving the Sale. The Sale closed on May 1, 2009. Among other things, in connection with the closing of the Sale, the Stalking Horse Purchasers assumed the outstanding obligations as of the closing concerning the Prepetition Loan Documents and the DIP Financing. Thus, following the closing of the Sale neither the Prepetition Loan Documents nor the DIP Financing give rise to any Claims against the Debtors.

(vi)    Retiree Issues

a.    The Pension Plan

On or about March 27, 2009, the PBGC filed proofs of claim against each of the Debtors related to (i) pension insurance premiums for the Pension Plan; (ii) unfunded benefit liabilities for the Pension Plan; and (iii) minimum funding contributions for the Pension Plan (collectively, the "*PBGC Claims*"). The PBGC asserted administrative expense, priority and unsecured claims in each of the PBGC Claims. On August 14, 2009, the Debtors objected to each of the PBGC Claims and sought to reclassify the PBGC Claims as unsecured claims and to disallow portions of certain of the PBGC Claims.

On or about September 16, 2009, the PBGC provided the Debtors with a Notice of Determination (the "*Notice of Determination*") which stated the PBGC's determination that the Pension Plan should be terminated and the PBGC's intention to seek termination of the Pension Plan. The Notice of Determination also stated that the PBGC intended to have the PBGC appointed as statutory trustee and to have March 23, 2009, established as the Pension Plan's termination date.

Subsequently, the PBGC and the Debtors conducted negotiations concerning the PBGC Claims and the termination of the Pension Plan. After arms-length negotiations, the Debtors and the PBGC agreed to resolve their disputes pursuant to a settlement agreement (the "*PBGC Settlement Agreement*"). On November 19, 2009, the Bankruptcy Court entered an order approving the PBGC Settlement Agreement.

Under the PBGC Settlement Agreement, the PBGC Claims were all deemed withdrawn except that the PBGC retained (a) a priority tax claim under Bankruptcy Code section 507(a)(8) against Canal Corporation in the amount of $200,000; and (b) an allowed general unsecured claim against Canal Corporation in the amount of $16,146,250.[4] In addition, the PBGC Settlement Agreement provided that the Pension Plan had a termination date of March 23, 2009.

---

[4]    This section of the Disclosure Statement only summarizes the PBGC Settlement Agreement and is qualified in all respects by the terms of the PBGC Settlement Agreement. To the extent that any description of the PBGC Settlement Agreement contained herein conflicts with the terms of the PBGC Settlement Agreement, the PBGC Settlement Agreement shall control in all respects.

b.    The Post-Retirement Participating Plan

After analyzing the issues concerning the Premium Contributions, the VEBA Trust and the Post-Retirement Participating Plan, the Debtors concluded that they held the Premium Contributions subject to both an express and a constructive trust, and that therefore the Premium Contributions were not property of the Estates.  Accordingly, the Debtors sought authority from the Bankruptcy Court to transfer the Premium Contributions to the VEBA Trust.  On August 24, 2009, the Bankruptcy Court entered an order authorizing the Debtors to transfer the Premium Contributions to the VEBA Trust.  After the entry of the order, Canal Corporation transferred the Premium Contributions, which totaled more that $700,000, to the VEBA Trust.

In accordance with applicable non-bankruptcy law and the operative documents concerning the VEBA Trust and the Post-Retirement Participating Plan, Canal Corporation and Frank Russell Company entered into an amended and restated trust agreement concerning the VEBA Trust as of April 1, 2009 (the "*Restated Trust Agreement*").  The Restated Trust Agreement amended and restated the terms that govern the VEBA Trust by providing that (i) the VEBA Trust would not provide group term life insurance benefits after May 31, 2009; (ii) the VEBA Trust could purchase long term disability insurance policies for the four beneficiaries receiving long term disability benefits under the VEBA Trust and that the VEBA Trust would no longer provide such benefits; and (iii) upon the termination of the Post-Retirement Participating Plan, the VEBA Trust could distribute the remaining assets of the VEBA Trust to the beneficiaries of the Post-Retirement Participating Plan.

Thereafter, in accordance with applicable law and the operative documents concerning the VEBA Trust and the Post-Retirement Participating Plan, the Post-Retirement Participating Plan and the Restated Trust Agreement were modified as of January 1, 2010.  Pursuant to these modifications, among other things (i) the Post-Retirement Participating Plan was revised to no longer indicate that it was maintained by an employer and to indicate that it is simply part of the arrangement of the VEBA Trust; (ii) any authority, duties or responsibilities of Canal Corporation were shifted to a committee of beneficiaries of the Post-Retirement Participating Plan (the "*Post-Retirement Participating Plan Committee*"); (iii) the Post-Retirement Participating Plan was expressly limited to medical benefits; (iv) the authority to amend the documents concerning the VEBA Trust and to give directions to the trustee of the VEBA Trust was shifted to the Post-Retirement Participating Plan Committee; and (v) the indemnity provisions concerning the VEBA Trust were limited to assets of the VEBA Trust.  Thus, following the modifications as of January 1, 2010, none of the Plan Debtors have any obligations or responsibilities concerning the Post-Retirement Participating Plan or the VEBA Trust.

(vii)    Miscellaneous Asset Sales

On October 22, 2009, the Bankruptcy Court entered an order that authorized the Plan Debtors to sell certain types of assets for sale prices of up to $500,000 pursuant to the procedures set forth in the order (the "*Miscellaneous Asset Sale Order*").  Thereafter, the Plan Debtors sold certain assets in accordance with the procedures the Miscellaneous Asset Sale Order established.

(viii)    The Tax Proceeding and the IRS Settlement Agreement

On May 25, 2006, the Internal Revenue Service (the "*IRS*") issued a notice of deficiency to Canal Corporation, claiming a deficiency of $183,458,981 for the tax year ended December 31, 1999, in connection with the contribution of certain assets of Wisconsin Tissue Mills, Inc., to Georgia-Pacific Tissue, LLC.

In response, on July 21, 2006, Canal Corporation filed a petition in the United States Tax Court (the "*Tax Court*") which commenced the Tax Court proceeding (the "*Tax Proceeding*"). On December 19, 2006, Canal Corporation filed a correlative claim for refund for the same amount for the tax year ended December 31, 2001.  As a result, the amount really at issue is two years' interest on $183,458,981 (and interest thereon).  On February 16, 2007, the IRS asserted a "substantial understatement" penalty in addition to the tax deficiency.

As of on or about the Petition Date, the interest portion of the alleged tax claim, net of the refund Canal Corporation has not been paid for 2001, amounted to approximately $38.3 million. The penalty portion of the alleged tax claim, and the interest on the penalty portion, amounted to approximately $71.4 million.

On or about March 10, 2009, the IRS filed a proof of claim against Canal Corporation that asserts (i) a section 507(a)(8) priority claim based on the interest portion of the alleged tax claim; (ii) a general unsecured claim based on the penalty portion and the interest on the penalty portion of the alleged tax claim; and (iii) section 507(a)(8) priority claims based on taxes related to 1994, 1995 and 1997.

On June 15, 2009, the Court entered an order granting relief from the automatic stay to allow the Tax Proceeding to proceed before the Tax Court for trial, briefing, opinion and entry of a decision, and to permit the assessment of any tax liability determined by the Tax Court.  On August 5, 2010, the Tax Court issued its decision (the "*Tax Court Decision*").  In the Tax Court Decision, the Tax Court ruled in favor of the IRS.  On October 29, 2010, the Debtors timely filed a Notice of Appeal of the Tax Court Decision.

After the entry of the Tax Court Decision, the Debtors and the IRS conducted negotiations concerning a potential global resolution of all outstanding claims between them. After arms-length negotiations, the Debtors and the IRS agreed to resolve their disputes in accordance with the terms of the IRS Settlement Agreement.  On December 2, 2010, the Bankruptcy Court entered the IRS Settlement Order which approved the IRS Settlement Agreement.

The IRS Settlement Agreement, among other things, provides that the IRS will receive the IRS Settlement Claim.[5]  The IRS Settlement Claim entitles the IRS to receive an amount equal to fifty percent (50%) of all amounts available to be distributed under the Plan to Holders of Allowed (i) Priority Tax Claims under section 507(a)(8) of the Bankruptcy Code, (ii) Priority

---

[5]    This section of the Disclosure Statement only summarizes the IRS Settlement Agreement and is qualified in all respects by the terms of the IRS Settlement Agreement.  To the extent that any description of the IRS Settlement Agreement contained herein conflicts with the terms of the IRS Settlement Agreement, the IRS Settlement Agreement shall control in all respects.

Non-Tax Claims under sections 507(a)(9) and 507(a)(10) of the Bankruptcy Code and (iii) General Unsecured Claims.  Distributions on account of the IRS Settlement Claim shall be made at the time of Distributions to Holders of Allowed (i) Priority Tax Claims under section 507(a)(8) of the Bankruptcy Code, (ii) Priority Non-Tax Claims under sections 507(a)(9) and 507(a)(10) of the Bankruptcy Code or (iii) General Unsecured Claims.  For example, if a total of $250,000 is distributed to pay Holders of Allowed (i) Priority Tax Claims under section 507(a)(8) of the Bankruptcy Code and (ii) Priority Non-Tax Claims under sections 507(a)(9) and 507(a)(10) of the Bankruptcy Code, then the IRS would receive a Distribution of $250,000.  Similarly, if Holders of Allowed General Unsecured Claims ultimately receive Distributions in the total amount of $2 million, then the IRS would receive Distributions of $2 million.

The IRS Settlement Agreement is predicated on the Confirmation Order becoming a final order and the Plan providing for the substantive consolidation of the Plan Debtors.  If these conditions do not happen, the IRS Settlement Agreement will not become effective and the Debtors and the IRS will return to their disputed positions and may pursue all of their rights and remedies, including, without limitation, the appeal of the Tax Court Decision.

(ix)    Avoidance Actions

On or about November 17, 2010, the Plan Debtors sent demand letters to numerous transferees concerning potential Causes of Action pursuant to chapter 5 of the Bankruptcy Code.  Subsequently, the Plan Debtors engaged in negotiations and reached proposed settlement agreements or tolling agreements with certain of the transferees.  In addition, following further investigation concerning the potential Causes of Action the Plan Debtors determined in their good-faith business judgment not to pursue some of the potential Causes of Action.  In December 2010, certain of the Plan Debtors initiated Causes of Action against certain of the transferees pursuant to, among other things, chapter 5 of the Bankruptcy Code.  Such Causes of Action are in the initial stages of litigation.

## V. THE PLAN

THE FOLLOWING SUMMARY PROVIDES ONLY A GENERAL OVERVIEW OF THE PLAN, WHICH SUMMARY IS QUALIFIED IN ITS ENTIRETY BY, AND SHOULD BE READ IN CONJUNCTION WITH, THE PLAN AND THE DISCUSSIONS APPEARING ELSEWHERE IN THIS DISCLOSURE STATEMENT.

## A.        Classification and Treatment of Claims and Interests

The Plan designates seven Classes of Claims, one Class of Interests and leaves certain Claims unclassified.  The following sections describe more fully the classification and treatment of Claims and Interests under the Plan.

1.        <u>Unclassified Claims</u>

(a)      Administrative Claims

Administrative Claims are those Claims against one or more of the Plan Debtors constituting a cost or expense of administration of the Cases of the kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 363, 364(c)(1), 365, 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code (other than a Professional Fee Claim) for the period from the Petition Date to the Effective Date.  The Bankruptcy Code does not require Administrative Claims to be classified under a plan.  It does, however, require that Allowed Administrative Claims be paid in full in cash in order for a plan to be confirmed, unless a Holder of such a Claim consents to different treatment.

The Plan establishes the Claims Bar Date for applications or requests for payment of Administrative Claims arising prior to the Confirmation Date as the first Business Day that is twenty (20) days after the Confirmation Date.

Pursuant to the Plan, on, or as soon as is reasonably practicable after, the date that is fifteen (15) days after the later of the Effective Date and the date on which such Administrative Claim becomes an Allowed Administrative Claim, a Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, settlement and release of and in exchange for such Allowed Administrative Claim, (i) Cash equal to the unpaid portion of such Allowed Administrative Claim or (ii) such other treatment as to which such Holder and the Plan Debtors shall have agreed upon in writing; *provided, however*, that Allowed Administrative Claims with respect to liabilities incurred by a Plan Debtor in the ordinary course of business during the Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto by the Plan Debtors.

(b)      Professional Fee Claims

Professional Fee Claims include all fees and expenses claimed by Professionals retained by the Plan Debtors or the Committee that have been approved on a final basis by a Final Order.  Professional Fee Claims do not include professional fees and expenses incurred by any professionals in connection with their retention and employment by the Plan Debtors on or after the Effective Date.  The Plan Debtors shall pay Professionals who are entitled to reimbursement or allowance of fees and expenses from the Estates, in Cash, in the amount awarded to such Professionals by Final Order of the Bankruptcy Court, as soon as practicable after the later of the Effective Date and the date upon which any order awarding fees and expenses becomes a Final Order, in accordance with the terms of any order entered by the Bankruptcy Court governing the payment of such fees and expenses.  Any final application for allowance of a Professional Fee Claim must be filed with the Bankruptcy Court and served on counsel for the Plan Debtors and the Committee and the U.S. Trustee so that it is received no later than forty-five (45) days after the Effective Date or such Professional Fee Claim shall be forever barred.  Allowed Professional Fee Claims must be paid in full or reserved for in Cash pending allowance by the Bankruptcy Court prior to any payment to Holders of Allowed General Unsecured Claims.

(c)    Priority Tax Claims

Priority Tax Claims are Claims asserted against one or more of the Plan Debtors, other than the IRS Settlement Claim, for an amount entitled to priority under section 507(a)(8) of the Bankruptcy Code.  The Bankruptcy Code does not require Priority Tax Claims to be classified under a plan, but requires that such Claims receive the treatment described below unless the Holder of such Claim consents to different treatment.  Unless a Final Order provides otherwise, each Holder of a Priority Tax Claim that is an Allowed Claim shall receive, at the discretion of the Plan Debtors and in full and final satisfaction of such Holder's Allowed Claim, (i) Cash in an amount equal to the unpaid portion of such Allowed Claim, (ii) payment of such Allowed Claim over a period not to exceed five (5) years with interest, or (iii) some other, less favorable treatment as is agreed upon by the Plan Debtors and the Holder of such Allowed Priority Tax Claim.  Notwithstanding the foregoing, the Holder of an Allowed Priority Tax Claim shall not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim.  Any Claim or demand for any such penalty (i) will be subject to treatment as an Other General Unsecured Claim, if and to the extent an Allowed Claim, and (ii) the Holder of an Allowed Priority Tax Claim shall not assess or attempt to collect such amounts from the Plan Debtors or the Assets except as an Other General Unsecured Claim, if and to the extent an Allowed Claim.

2.         Class 1 – Priority Non-Tax Claims

Class 1 consists of all Allowed Priority Non-Tax Claims.  Common examples of such Claims include wage claims earned within 180 days of the Petition Date entitled to priority under section 507 of the Bankruptcy Code that do not exceed the sum of $10,950.00 for each individual employee.  Pursuant to authority granted by the Bankruptcy Court, the Plan Debtors have paid substantially all of these Claims on a current basis and, therefore, anticipate that that there will be few, if any, Allowed Class 1 Claims.  To the extent that there are any Allowed Class 1 Claims, the Holder of such a Claim shall receive (i) all amounts to which such Holder is entitled on account of such Allowed Claim on the later of (a) the Effective Date, or as soon thereafter as is reasonably practicable, and (b) the date when such Allowed Claim becomes due and payable according to its terms and conditions, or (ii) such other, less favorable treatment as is agreed upon by the Plan Debtors and the Holder of such Allowed Priority Non-Tax Claim.  Accordingly, Class 1 Claims are unimpaired and are not entitled to vote on the Plan pursuant to Bankruptcy Code section 1126(f).

3.         Class 2 – Secured Claims

Class 2 consists of Allowed Secured Claims.  The Plan Debtors anticipate that there will be few, if any, Allowed Class 2 Claims.  To the extent that there are any Allowed Class 2 Claims, at the sole option of the Plan Debtors, (i) Allowed Class 2 Claims will be unaltered and, subject to the requirements of section 1124(2) of the Bankruptcy Code, on the Effective Date, the legal equitable and contractual rights of the Holder of Allowed Class 2 Claims shall be reinstated in full, or (ii) the Holder of the Allowed Class 2 Claim shall receive in full satisfaction, settlement, and release of, and in exchange for, the Holder's Allowed Secured Claim, at the sole option of the Plan Debtors, (a) Cash in the amount of the Allowed Secured Claim on the later of

25

the Effective Date and the date such Claim becomes an Allowed Claim, or as soon thereafter as practicable, (b) the property of the Estates which constitutes collateral for such Allowed Secured Claim on the later of the Effective Date and the date such Claim becomes an Allowed Claim, or as soon thereafter as practicable, or (c) such other, less favorable treatment as is agreed upon by the Plan Debtors and the Holder of such Allowed Class 2 Claim.  Accordingly, Class 2 Claims are unimpaired and are not entitled to vote on the Plan pursuant to Bankruptcy Code section 1126(f).

4.         Class 3A – Other General Unsecured Claims

Class 3A consists of Allowed Other General Unsecured Claims.  Each Holder of an Allowed Claim in Class 3A shall receive its Ratable Amount of the Class 3A Portion of the General Unsecured Distribution Pool.  Class 3A is an impaired Class and is entitled to vote on the Plan.

5.         Class 3B – Revenue Bond Claims

Class 3B consists of Allowed Revenue Bond Claims.  Each Holder of an Allowed Claim in Class 3B shall receive its Ratable Amount of both (i) the Class 3B Portion of the General Unsecured Distribution Pool; and (ii) the Class 3C Portion of the General Unsecured Distribution Pool.  Class 3B is an impaired Class and is entitled to vote on the Plan.

6.         Class 3C – Subordinated Note Claims

Class 3C consists of all Allowed Subordinated Note Claims.  Each Holder of an Allowed Claim in Class 3C shall be deemed to have received its Ratable Amount of the Class 3C Portion of the General Unsecured Distribution Pool and immediately upon the receipt thereof to have transferred such Ratable Amount to the Holders of Allowed Class 3B Claims in accordance with the contractual subordination provisions in the documents under which the Subordinated Note Claims arise and section 510(a) of the Bankruptcy Code.  Class 3C is an impaired Class and is entitled to vote on the Plan.

7.         Class 4 – IRS Settlement Claim

Class 4 consists of the IRS Settlement Claim.  The IRS shall receive Distributions on the IRS Settlement Claim in accordance with the IRS Settlement Agreement, which is more fully discussed in Section IV.F.(viii) hereof.  Class 4 is an impaired Class and is entitled to vote on the Plan.

8.         Class 5 – Intercompany Claims

Class 5 consists of all Intercompany Claims.  In connection with, to the extent of and as a result of, the substantive consolidation of the Estates and the Cases, on the Confirmation Date or such other date as may be set by an order of the Bankruptcy Court, but subject to the occurrence of the Effective Date, all Intercompany Claims shall be deemed eliminated, cancelled and/or extinguished and the Holders of Class 5 Claims shall not be entitled to, and shall not receive or retain any property or interest in property on account of such Claims.  Class 5 is an impaired

Class and conclusively deemed to have voted to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

       9.         <u>Class 6 – Interests</u>

Class 6 consists of all Interests in the Plan Debtors.  On the Effective Date, the Interests shall be cancelled and the Holders of the Interests shall receive no property or distribution under this Plan on account of such Interests.  Class 6 is an impaired Class and conclusively deemed to have voted to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

## B.        Disputed Claims and Interests

No payment or other Distribution or treatment shall be made on account of a Disputed Claim, even if a portion of the Claim is not disputed, unless and until such Disputed Claim becomes an Allowed Claim and the amount of such Allowed Claim is determined by a Final Order or, after the Effective Date, by written agreement between the Plan Debtors and the Holder of the Claim.  No Distribution or other payment or treatment shall be made on account of a Disallowed Claim at any time.  All amounts on deposit from time to time in the Disputed Claims Reserve and all dividends, interest, and other earnings thereon, net of any applicable taxes and expenses, shall be held in trust for the exclusive benefit of Holders of Disputed Claims that subsequently become Allowed Claims and the Holders of Allowed Claims, until such time as all Allowed Claims have been paid the Distributions to which such Holders are entitled under the terms of the Plan.

## C.        Means for Implementation of the Plan

The Plan is premised upon, among other things, the IRS Settlement Agreement becoming effective and the substantive consolidation of the Plan Debtors.

1.        <u>IRS Settlement Agreement</u>

In accordance with the IRS Settlement Agreement, among other things, the IRS has agreed to receive the IRS Settlement Claim, which is discussed more fully in the IRS Settlement Agreement and in <u>Section IV.F.(viii)</u> hereof.

2.        <u>Substantive Consolidation</u>

The Estates and the Cases shall be substantively consolidated on the Effective Date. Accordingly, on the Effective Date: (i) all Intercompany Claims by, between and among the Plan Debtors shall be deemed eliminated, (ii) all assets and liabilities of the Plan Debtors shall be merged or treated as if they were merged with the assets and liabilities of Canal Corporation, (iii) any obligation of a Plan Debtor and all guarantees thereof by one or more of the other Plan Debtors shall be deemed to be one obligation of Canal Corporation, (iv) the Interests shall be cancelled and (v) each Claim filed or to be filed against any Plan Debtor shall be deemed filed only against the consolidated Canal Corporation and shall be deemed a single Claim against and a single obligation of the consolidated Canal Corporation. On the Effective Date, in accordance with the terms of the Plan, all Claims based upon guarantees of collection, payment, or

performance made by the Plan Debtors as to the obligations of another Plan Debtor shall be released and of no further force and effect. *For the avoidance of doubt, WTM I Company is not a Plan Debtor and shall not be subject to substantive consolidation with the Plan Debtors*.

The Plan and Disclosure Statement, jointly, shall serve as, and shall be deemed to be, a motion for entry of an order approving the substantive consolidation of the Cases. If no objection to substantive consolidation is timely filed and served by any Holder of an impaired Claim affected by the Plan as provided herein on or before the Ballot Deadline or such other date as may be established by the Bankruptcy Court, substantive consolidation may be approved by the Bankruptcy Court. If any objections are timely filed and served, a hearing with respect to substantive consolidation and the objections thereto shall be scheduled by the Bankruptcy Court, which hearing may, but is not required to, coincide with the Confirmation Hearing.

Substantive consolidation of the estates of multiple debtors in bankruptcy effectuates a combination of the assets and liabilities of the involved debtors for certain purposes. The common effects of consolidation are (i) the pooling of the assets of, and claims against, the consolidated debtors; (ii) satisfying liabilities from a common fund; and (iii) combining the creditors of the debtors for purposes of voting on plans of reorganization or liquidation. The Plan contemplates and is predicated upon entry of an order substantively consolidating the Estates and the Cases.

Substantive consolidation of multiple debtors under a plan is expressly permitted by section 1123(a)(5)(C) of the Bankruptcy Code. *See, e.g., In re Stone & Webster, Inc.,* 286 B.R. 532, 546 (Bankr. D. Del. 2002) ("§ 1123(a)(5)(C) clearly authorizes a bankruptcy court to confirm a chapter 11 plan containing a provision that substantively consolidates the estates of two or more debtors."); *see also Schnelling v. Crawford (In re James River Coal Co., Inc.),* 360 B.R. 139, 148, n.1 (Bankr. E.D. Va. 2007) (Huennekens, J.) (noting that "it is not unusual for bankruptcy courts to confirm plans of reorganization to call for the 'substantive consolidation' of the different corporate entities comprising the corporate group").

3.    Continuing Existence

From and after the Effective Date, the Plan Debtors shall continue in existence for the purposes consistent with the terms of the Plan, including, without limitation, (i) winding up their affairs; (ii) liquidating the Assets; (iii) enforcing and prosecuting claims, interests, rights and privileges of the Plan Debtors and the Estates, including, without limitation, Causes of Action; (iv) resolving Disputed claims; (v) administering the Plan and taking such actions as are necessary to effectuate the Plan; and (vi) filing appropriate tax returns. For the avoidance of doubt, as of the Effective Date, all Assets shall remain property of the Estates, and shall be free and clear of all Claims, Liens, and Interests, and all setoff and/or recoupment rights, except as otherwise specifically provided in the Plan or in the Confirmation Order.

4.    Appointment of Plan Administrator

As of the Effective Date, the Plan Administrator shall be vested with full legal power, capacity and authority, and shall be a Person designated by the Plan Debtors under the Plan and

Plan Administrator Agreement and approved by the Bankruptcy Court without bond, unless otherwise ordered by the Bankruptcy Court.  The Plan Administrator shall be compensated in accordance with the terms of the Plan Administrator Agreement.  The Plan Administrator may be removed or replaced in accordance with the procedures set forth in the Plan Administrator Agreement.

The Plan Administrator shall be deemed the Estates' representative in accordance with the Bankruptcy Code, including but not limited to section 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified in the Plan and the Plan Administrator Agreement.  In particular, the rights, duties and powers of the Plan Administrator shall include, without limitation, the following, but in all cases shall be subject to and consistent with the terms of the Plan: (i) the Plan Administrator shall succeed to all such powers as would have been applicable to any officer, director, manager or shareholder of the Plan Debtors with like effect as if authorized, exercised and taken by unanimous action of such officers, directors, managers and shareholders, and the Plan Administrator shall be authorized to take all steps necessary to wind-down the affairs of the Plan Debtors and to take such other actions as the Plan Administrator determines is in the best interests of the Claim or Interest Holders; (ii) the Plan Administrator, in his, her or its reasonable business judgment, and in an expeditious but orderly manner, shall cause the Plan Debtors to liquidate, convert to cash the Assets, and make all Distributions in accordance with this Plan; and (iii) the Plan Administrator shall receive the other rights and powers identified in, or consistent with, the Plan.

5.      Payment of Statutory Fees

All fees payable on or before the Effective Date pursuant to section 1930 of title 28 of the United States Code shall be paid by the Plan Debtors.  From and after the Effective Date, the Plan Debtors shall pay the fees assessed against the Estates until such time as a particular Case is closed, dismissed or converted.  In addition, the Plan Debtors shall file applicable post-confirmation quarterly reports in conformity with the U.S. Trustee guidelines.

6.      Insurance Preservation and Neutrality

The Plan and the Confirmation Order, including any exculpation provisions or releases, if applicable, shall not diminish or impair the ability of the Plan Debtors, the Plan Administrator or any other Person to enforce against insurers any policies of insurance that may cover Claims against the Plan Debtors, the Estates, the Plan Administrator or any other Person.  Similarly, the Plan and the Confirmation Order, including any exculpation provisions or releases, if applicable, shall not expand the scope of, or alter in any other way, the obligations of any insurers under any policies of insurance that may cover Claims against the Plan Debtors, the Estates, the Plan Administrator or any other Person and the insurers shall retain any and all defenses to coverage that such insurers may have.  All such policies of insurance shall remain in full force and effect. For the avoidance of doubt, the Plan and the Confirmation Order shall not diminish or impair any rights, claims, defenses, liabilities or obligations of (i) WTM I Company to any insurer or (ii) any insurer to WTM I Company.  In addition, the Plan and the Confirmation Order shall not limit or impair the ability of (a) the Plan Debtors to object to any Claims against the Estates filed by any insurer including, without limitation, Administrative, Priority, Secured or General Unsecured

29

Claims or (b) any insurer to respond to such objection or assert such Claims, which Claims shall be allowed or disallowed pursuant to applicable law.  Distributions on any Allowed Claims filed by any insurer against the Estates shall be made pursuant to this Plan and the Confirmation Order.

7.        United States Securities and Exchange Commission

Notwithstanding any provision herein to the contrary, no provision of the Plan or the Confirmation Order shall enjoin, impair or delay the United States Securities and Exchange Commission after the Effective Date from commencing or continuing any claims, causes of action, proceedings or investigations against any Person in any non-bankruptcy forum; *provided*, *however*, that nothing herein constitutes a waiver of any rights or defenses of any Person with respect to any claims, causes of action, proceedings or investigations by the United States Securities and Exchange Commission, including, without limitation, defenses related to validity, priority, amount and timeliness of such claims.  From and after the Effective Date, notwithstanding anything to the contrary in this Plan, to the extent requested by the United States Securities and Exchange Commission, the Plan Debtors shall take any and all actions necessary to evidence the suspension of the Plan Debtors' further reporting obligations with the United States Securities and Exchange Commission or their statutory or regulatory obligations as a publicly traded company, including, without limitation, seeking to deregister the Plan Debtors' securities pursuant to Section 12(j) of the Exchange Act.

D.        **Executory Contracts and Unexpired Leases**

The following shall be the treatment of Executory Contracts:

1.        Rejection of Certain Executory Contracts

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into in connection with the Plan, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the Plan Debtors will assume or assume and assign each of the Executory Contracts listed on Exhibit 7.1 to the Plan; *provided*, *however*, that the Plan Debtors reserve the right, at any time prior to the Effective Date, to amend Exhibit 7.1 to the Plan to (i) delete any Executory Contract listed therein, thus providing for its rejection pursuant to Section 7.2 of the Plan, or (ii) add any Executory Contract thereto, thus providing for its assumption pursuant to Section 7.1 of the Plan.  The Plan Debtors will provide notice of any amendments to Exhibit 7.1 to the Plan to the non-Debtor parties to the Executory Contracts affected thereby and to those parties entitled to notice pursuant to Bankruptcy Rule 2002.  Each contract and lease listed on Exhibit 7.1 to the Plan will be assumed only to the extent that such contract or lease constitutes an Executory Contract.  Listing a contract or lease on Exhibit 7.1 to the Plan will not constitute an admission by the Plan Debtors that the contract or lease is an Executory Contract or that the Plan Debtors have any liability thereunder.

2.        Executory Contracts Rejected if Not Assumed

On the Effective Date, except for an Executory Contract that was previously assumed, assumed and assigned or rejected by an order of the Bankruptcy Court, or that is assumed or

assumed and assigned pursuant to <u>Section 7.1</u> of the Plan, each Executory Contract of every kind and nature entered into by the Plan Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms prior to the Effective Date will be rejected pursuant to section 365 of the Bankruptcy Code, except: (i) any Executory Contract that is the subject of a separate motion to assume, assume and assign or reject filed pursuant to section 365 of the Bankruptcy Code by the Plan Debtors before the entry of the Confirmation Order, *provided*, *however*, that upon denial or withdrawal of any such motion, such Executory Contract or unexpired lease shall automatically be deemed rejected as of the Effective Date; and (ii) any agreement, obligation, security interest, transaction or similar undertaking that the Plan Debtors believe is not an Executory Contract that is later determined by the Bankruptcy Court to be an Executory Contract that is subject to assumption, assumption and assignment or rejection under section 365 of the Bankruptcy Code, which agreements shall be subject to assumption, assumption and assignment or rejection upon the approval of a motion to be filed by the Plan Debtors within thirty (30) days of any such determination in a Final Order.[6]  Any order entered after the Confirmation Date by the Bankruptcy Court, after notice and hearing, authorizing the rejection of an Executory Contract shall cause such rejection to be a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code, as if such relief were granted and such order were entered prior to the Confirmation Date.  The Confirmation Order will constitute an order of the Bankruptcy Court approving the rejection of the Executory Contracts as provided for by <u>Section 7.2</u> of the Plan, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.

      3.     <u>Cure Claims Related to the Assumption of Executory Contracts</u>

To the extent that any Cure Claim constitutes a monetary default, such Cure Claim will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the Plan Debtors' option: (a) by payment of the Cure Claim as an Allowed Administrative Claim or (b) on such other terms as are agreed to by the parties to the Executory Contract.  If a dispute arises regarding (x) the amount of any Cure Claim, (y) the ability of the Plan Debtors or assignee to provide adequate assurance of future performance under the contract or lease, or (z) any other matter pertaining to the assumption of such Executory Contract, the payment of the Cure Claim set forth in the preceding sentence will be made following the entry of a Final Order resolving the dispute and approving the assumption.

      4.     <u>Bar Date for Rejection Claims</u>

If the rejection of any Executory Contract under the Plan gives rise to a Claim by the non-Debtor party or parties to such Executory Contract, such Claim, to the extent that it is timely

---

[6]     For the avoidance of doubt, and without limiting in any way whether the Plan Debtors believe any other agreement, obligation, security interest, transaction or similar undertaking is not an Executory Contract, the Plan Debtors believe that the following are not Executory Contracts: (i) that certain Confidential Settlement, Release, and Hold Harmless Agreement among WTM I Company, Canal Corporation, Philip Morris USA, and the Carriers (as defined therein); (ii) that certain Order and Consent Decree entered by the Circuit Court of Henrico County, Virginia, in the matter of Philip Morris USA v. Canal Corporation and WTM I Company; (iii) that certain Joint Defense Agreement among WTM I Company, Canal Corporation and Philip Morris USA; and (iv) any policies of insurance to which any of the Plan Debtors are parties that were entered into prior to the Petition Date.

filed and is an Allowed Claim, shall be classified in Class 3A, 3B or 3C, as applicable; *provided*, *however*, that the General Unsecured Claim arising from such rejection shall be forever barred and shall not be enforceable against the Plan Debtors, their successors or properties, unless a proof of such Claim is filed and served on the Plan Debtors within thirty (30) days after the date of notice of the entry of the order of the Court rejecting the Executory Contract, which may include, if applicable, the Confirmation Order.   To the extent Rejection Claims initially are Disputed Claims, but subsequently become Allowed Claims, the Plan Debtors shall pay such Rejection Claims in accordance with this Plan, but nothing herein shall constitute a determination that any such rejection gives rise to or results in a Claim or constitutes a waiver of any objections to such Claim by the Plan Debtors or any party in interest.

**E.        Delivery of Distributions; Undeliverable Distributions; W-9 Forms**

Subject to Section 6.14(c) of the Plan, Distributions to Holders of Allowed Claims shall be made (1) at the addresses set forth on the respective Proofs of Claim or requests for allowance of Administrative Claims filed by such Holders, (2) at the addresses set forth in any written notices of address change delivered to the Plan Debtors after the date of any related Proof of Claim or (3) at the addresses reflected in the Plan Debtors' Schedules if no Proof of Claim has been filed and the Plan Debtors have not received a written notice of a change of address.

The Plan Debtors shall not have any obligation to make a Distribution on account of an Allowed Claim if the amount to be distributed to the specific Holder of the Allowed Claim on the particular Distribution date does not constitute a final Distribution to such Holder and such Distribution has a value less than $25.00.  The Plan Debtors shall have no obligation to make any Distribution on Claims Allowed in an amount less than $500.00.  Any undistributed Cash will vest in the Plan Debtors and become available Cash for Distribution on the final Distribution Date.

If the Distribution to the Holder of any Allowed Claim is returned to the Plan Debtors as undeliverable, no further Distribution shall be made to such Holder, and the Plan Debtors shall have no obligation to make any further Distribution to the Holder, unless and until the Plan Debtors are notified in writing of such Holder's then current address.  Subject to Section 6.14(c) of the Plan, the Plan Debtors shall retain undeliverable Distributions until such time as a Distribution becomes deliverable.  Any Holder of an Allowed Claim that does not assert a Claim for an undeliverable Distribution within one (1) year after the Distribution Date on account of such Claim shall no longer have any claim to or interest in such undeliverable Distribution and shall be forever barred from receiving any Distribution under the Plan and such amount shall be distributed in accordance with the terms of the Plan.

The Plan Debtors shall issue W-9 Forms to Holders of Allowed Claims entitled to Distribution (1) to the addresses set forth on the respective Proofs of Claim or requests for allowance of Administrative Claims filed by such Holders, (2) to the addresses set forth in any written notices of address change delivered to the Plan Debtors after the date of any related Proof of Claim or (3) to the addresses reflected in the Plan Debtors' Schedules if no Proof of Claim has been filed and the Plan Debtors have not received a written notice of a change of address. Holders of Allowed Claims failing to return completed W-9 Forms to the Plan Debtors within 30

days of the Plan Debtors' request for a completed W-9 Form (or within any further time period expressly agreed to in writing between the Plan Debtors and such Holder), shall not share in any Distribution under the Plan.

**F.        Retention of Jurisdiction**

> 1.        General Scope of Retention of Jurisdiction

Following the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Cases to the extent legally permissible, including, without limitation, such jurisdiction as is necessary to ensure that the purposes and intent of the Plan are carried out.

> 2.        Claims and Actions

The Bankruptcy Court shall retain jurisdiction (a) to classify, resolve objections to, and determine or estimate pursuant to section 502(c) of the Bankruptcy Code all Claims against, and Interests in, the Plan Debtors and (b) to adjudicate and enforce all Claims and Causes of Action of the Plan Debtors.

> 3.        Specific Jurisdiction

Without in any way limiting the scope of the Bankruptcy Court's retention of jurisdiction over the Cases as otherwise set forth in the Plan, the Bankruptcy Court shall retain jurisdiction for the following specific purposes:

> (a)        To determine all questions and disputes regarding title to the Assets, all causes of action, controversies, disputes or conflicts, whether or not subject to any pending action as of the Effective Date, between one or more of the Plan Debtors and any other party, including, without limitation, any Causes of Action and any right to recover Assets pursuant to the provisions of the Bankruptcy Code;

> (b)        To modify the Plan after the Effective Date pursuant to the Bankruptcy Code, the Bankruptcy Rules, and applicable law;

> (c)        To enforce and interpret the terms and conditions of the Plan or the Confirmation Order;

> (d)        To enter such orders, including, but not limited to, such future injunctions as are necessary to enforce the respective title, rights and powers of the Plan Debtors or the Plan Administrator, and to impose such limitations, restrictions, terms and conditions on such title, rights and powers as the Bankruptcy Court may deem necessary;

> (e)        To enter one or more final decrees closing the Cases;

(f)    To correct any defect, cure any omission or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to implement the purposes and intent of the Plan;

(g)    To determine any and all objections to the allowance or classification of Claims;

(h)    To adjudicate all claims or controversies to a security or ownership interest in any of the Assets or in any proceeds thereof;

(i)    To determine any and all applications for allowances of compensation and reimbursement of expenses and the reasonableness of any fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code;

(j)    To determine any applications or motions pending on the Effective Date for the rejection, assumption or assumption and assignment of any Executory Contract and to hear and determine, and, if need be, to liquidate any and all Claims arising therefrom;

(k)    To determine any and all motions, applications, adversary proceedings and contested matters that may be pending on the Effective Date or filed thereafter;

(l)    To remedy any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court to the extent authorized by the Plan or the Bankruptcy Court;

(m)    To determine all controversies, suits, and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan;

(n)    To consider and act on the compromise and settlement of any Claim against or Cause of Action by or against the Plan Debtors or the Plan Administrator arising under or in connection with the Plan;

(o)    To issue such orders in aid of execution of the Plan as may be authorized by section 1142 of the Bankruptcy Code;

(p)    To determine such other matters or proceedings as may be provided for under Title 28 or any other title of the United States Code, the Bankruptcy Code, the Bankruptcy Rules, other applicable law, the Plan or in any order or orders of the Bankruptcy Court, including, but not limited to, the Confirmation Order or any order which may arise in connection with the Plan or the Confirmation Order;

(q)    To make such orders as are necessary or appropriate to carry out the provisions of the Plan;

(r)    To adjudicate all claims of any nature by any person which may be adverse or otherwise affect the value of the property of the Estates dealt with by the Plan;

(s)    To determine any other matters not inconsistent with the Bankruptcy Code; and

(t)    To make such orders and/or take such action as is necessary to enjoin any interference with the implementation or the consummation of the Plan.

4.    <u>Failure of Bankruptcy Court to Exercise Jurisdiction</u>

If the Bankruptcy Court abstains from exercising, declines to exercise, or is otherwise without jurisdiction over any matter arising out of the Cases, including the matters set forth in <u>Article VIII</u> of the Plan, the provisions of the Plan shall not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

5.    <u>Revocation and Withdrawal of the Plan</u>

The Plan Debtors reserve the right to revoke or withdraw the Plan at any time before entry of a Confirmation Order.  If the Plan Debtors, or one of the individual Plan Debtors, as the case may be, revoke or withdraw the Plan prior to the Confirmation Date, or if Confirmation or the Effective Date does not occur with respect to one or more of the Plan Debtors, then the Plan shall be deemed to be null and void as to such Estates.  In such event, nothing contained herein, in the Plan or in any document relating to the Plan shall be deemed to constitute an admission of validity, waiver or release of any Claims by or against such Plan Debtors or any Person or to prejudice in any manner the rights of such Plan Debtors or any Person in any proceeding involving such Plan Debtors.

6.    <u>Section 1145 Exemption.</u>

Except with respect to an entity that is an underwriter as defined in subsection (b) of section 1145 of the Bankruptcy Code, pursuant to section 1145 of the Bankruptcy Code, neither section 5 of the Securities Act of 1933 nor any State or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in securities shall apply with respect to any security being offered, sold or transferred under the Plan on account of Allowed Claims.

7.    <u>Section 1146(a) Exemption</u>

Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer or exchange of any security under the Plan or the making or delivery of any instrument of transfer pursuant to, in implementation of, or as contemplated by the Plan, or the re-vesting, transfer or sale of any real or personal property of the Plan Debtors pursuant to, in implementation of, or as contemplated by the Plan shall not be taxed under any state or local law imposing a stamp tax, transfer tax or similar tax or fee.

**G.**        **Injunction, Releases and Exculpation**

1.        Injunction

For the avoidance of doubt, Protected Party means any of the Estates or the Plan Administrator, each solely in their respective capacities.

*EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE DOCUMENTS EXECUTED PURSUANT TO THE PLAN, OR THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES WHO HAVE HELD, CURRENTLY HOLD, OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN THE PLAN DEBTORS OR THE ESTATES THAT AROSE PRIOR TO THE EFFECTIVE DATE (INCLUDING BUT NOT LIMITED TO STATES AND OTHER GOVERNMENTAL UNITS, AND ANY STATE OFFICIAL, EMPLOYEE, OR OTHER ENTITY ACTING IN AN INDIVIDUAL OR OFFICIAL CAPACITY ON BEHALF OF ANY STATE OR OTHER GOVERNMENTAL UNIT) WILL BE PERMANENTLY ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS ON ACCOUNT OF ANY SUCH CLAIMS OR INTERESTS (I) COMMENCING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ACTION OR OTHER PROCEEDING AGAINST ANY PROTECTED PARTY OR ANY PROPERTY OF ANY PROTECTED PARTY; (II) ENFORCING, ATTACHING, EXECUTING, COLLECTING, OR RECOVERING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST ANY PROTECTED PARTY; (III) CREATING, PERFECTING, OR ENFORCING, DIRECTLY OR INDIRECTLY, ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST ANY PROTECTED PARTY OR ANY PROPERTY OF ANY PROTECTED PARTY; (IV) ASSERTING OR EFFECTING, DIRECTLY OR INDIRECTLY, ANY SETOFF OR RIGHT OF SUBROGATION OF ANY KIND AGAINST OBLIGATIONS DUE TO ANY PROTECTED PARTY OR ANY PROPERTY OF ANY PROTECTED PARTY; OR (V) ANY ACT, IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO, COMPLY WITH, OR IS INCONSISTENT WITH ANY PROVISIONS OF THE PLAN; PROVIDED, HOWEVER, THAT NOTHING CONTAINED IN THE PLAN SHALL PRECLUDE SUCH PERSONS FROM EXERCISING THEIR RIGHTS PURSUANT TO AND CONSISTENT WITH THE TERMS OF THE PLAN.*

2.        Term of Stay

*EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE DOCUMENTS EXECUTED PURSUANT TO THE PLAN, THE CONFIRMATION ORDER OR AN APPLICABLE ORDER OF THE BANKRUPTCY COURT, ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CASES PURSUANT TO SECTIONS 105 OR 362 OF THE BANKRUPTCY CODE SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE ENTRY OF A FINAL DECREE IN ALL OF THE CASES. IN ACCORDANCE THEREWITH AND WITHOUT LIMITING THE FOREGOING, BUT SUBJECT TO THE EXCEPTION TO THE AUTOMATIC STAY SET FORTH IN SECTION 362(b)(4), UNTIL THE ENTRY OF A FINAL DECREE IN ALL OF THE CASES, ALL PERSONS OR ENTITIES ARE STAYED FROM (I) THE COMMENCEMENT OR CONTINUATION OF*

*ANY JUDICIAL, ADMINISTRATIVE OR OTHER ACTION OR PROCEEDING, INCLUDING THE EMPLOYMENT OF SERVICE OF PROCESS, AGAINST THE PLAN DEBTORS THAT WAS OR COULD HAVE BEEN COMMENCED PRIOR TO THE PETITION DATE, OR TO RECOVER A CLAIM AGAINST THE PLAN DEBTORS THAT AROSE PRIOR TO THE PETITION DATE; (II) THE ENFORCEMENT, AGAINST THE PLAN DEBTORS OR AGAINST PROPERTY OF THE ESTATES, OF A JUDGMENT OBTAINED BEFORE THE PETITION DATE; (III) ANY ACT TO OBTAIN POSSESSION OF PROPERTY OF THE ESTATES OR OF PROPERTY FROM THE ESTATES OR TO EXERCISE CONTROL OVER PROPERTY OF THE ESTATES; (IV) ANY ACT TO CREATE, PERFECT, OR ENFORCE ANY LIEN AGAINST PROPERTY OF THE ESTATES; AND (V) ANY ACT TO COLLECT, ASSESS, OR RECOVER A CLAIM AGAINST THE PLAN DEBTORS THAT AROSE BEFORE THE PETITION DATE; PROVIDED, HOWEVER, THAT NOTHING CONTAINED IN THE PLAN SHALL PRECLUDE SUCH PERSONS FROM EXERCISING THEIR RIGHTS PURSUANT TO AND CONSISTENT WITH THE TERMS OF THE PLAN.*

3.    Debtor Release

For the avoidance of doubt, Debtor Releasors means the Plan Debtors, the Estates, any of their respective predecessors or successors in interest, and any Person claiming through any of the foregoing.

Also for the avoidance of doubt, Debtor Releasees means, collectively, each solely in their respective capacities as such, (a) all current and former members (including ex officio members), officers, directors, managers and employees of the Plan Debtors or the Committee; (b) all attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, and professionals of any Plan Debtor, the Committee or the members of the Committee; and (c) each of their respective predecessors and successors in interest, and all of their respective current and former members (including ex officio members), officers, directors, managers, employees, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, and professionals.

*EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE DOCUMENTS EXECUTED PURSUANT TO THE PLAN, OR THE CONFIRMATION ORDER, ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE DEBTOR RELEASEES, INCLUDING, WITHOUT LIMITATION, THE SERVICES OF THE PLAN DEBTORS' PRESENT AND FORMER MEMBERS (INCLUDING EX OFFICIO MEMBERS), OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES AND ADVISORS IN FACILITATING THE IMPLEMENTATION OF THE LIQUIDATION CONTEMPLATED HEREBY, EACH OF THE DEBTOR RELEASORS SHALL FULLY RELEASE (AND, AUTOMATICALLY WITHOUT FURTHER ACTION, EACH DEBTOR RELEASEE SO RELEASED SHALL BE DEEMED FULLY RELEASED BY THE DEBTOR RELEASORS) EACH DEBTOR RELEASEE AND THEIR RESPECTIVE PROPERTIES FROM ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, WHETHER ARISING PRIOR TO OR AFTER THE PETITION DATE, FORESEEN OR*

*UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW OR AT EQUITY, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE PLAN DEBTORS OR THE ESTATES, INCLUDING, WITHOUT LIMITATION, THOSE THAT ANY OF THE PLAN DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE PLAN DEBTORS OR ANY OF THE ESTATES, AND FURTHER INCLUDING THOSE IN ANY WAY RELATED TO THE CASES, THE PLAN, THE DISCLOSURE STATEMENT, THE SALE OR LIQUIDATION OF ANY PROPERTY OF THE ESTATES, THE PLAN DEBTORS' BUSINESSES AND OPERATIONS, THE PLAN DEBTORS' INTERESTS, THE PLAN DEBTORS' DEBT OBLIGATIONS, THE PLAN DEBTORS' FINANCING AGREEMENTS OR THE PLAN DEBTORS' LEASES AND OTHER CONTRACTS; PROVIDED, HOWEVER, THAT NOTHING CONTAINED IN THE PLAN SHALL PRECLUDE SUCH PERSONS FROM EXERCISING THEIR RIGHTS PURSUANT TO AND CONSISTENT WITH THE TERMS OF THE PLAN.*

4.     <u>Third Party Release</u>

For the avoidance of doubt, Released Parties means, collectively, each solely in their respective capacities as such, all officers and directors of any Plan Debtor who served in such capacity on or after the Petition Date.

*EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE DOCUMENTS EXECUTED PURSUANT TO THE PLAN, OR THE CONFIRMATION ORDER, HOLDERS OF CLAIMS (A) VOTING TO ACCEPT THE PLAN OR (B) ABSTAINING FROM VOTING ON THE PLAN AND ELECTING NOT TO OPT OUT OF THE THIRD PARTY RELEASE CONTAINED IN <u>SECTION 9.5</u> OF THE PLAN (WHICH BY DEFINITION DOES NOT INCLUDE HOLDERS OF CLAIMS AND INTEREST WHO ARE DEEMED TO HAVE VOTED AGAINST THE PLAN), ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE, SHALL FULLY RELEASE (AND, AUTOMATICALLY WITHOUT FURTHER ACTION, EACH RELEASED PARTY SHALL BE DEEMED RELEASED) THE RELEASED PARTIES AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, WHETHER ARISING PRIOR TO OR AFTER THE COMMENCEMENT DATE, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW OR AT EQUITY, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE PLAN DEBTORS OR THE ESTATES, INCLUDING, WITHOUT LIMITATION, THOSE IN ANY WAY RELATED TO THE CASES, THE PLAN, THE SALE OR LIQUIDATION OF ANY PROPERTY OF THE ESTATES, THE PLAN DEBTORS' BUSINESSES AND OPERATIONS, THE PLAN DEBTORS' INTERESTS, THE PLAN DEBTORS' DEBT OBLIGATIONS, THE PLAN DEBTORS' FINANCING AGREEMENTS*

38

*OR THE PLAN DEBTORS' LEASES AND OTHER CONTRACTS; <u>PROVIDED,
HOWEVER,</u> THAT NOTHING CONTAINED IN THE PLAN SHALL PRECLUDE SUCH
PERSONS FROM EXERCISING THEIR RIGHTS PURSUANT TO AND CONSISTENT
WITH THE TERMS OF THE PLAN; AND <u>PROVIDED, FURTHER,</u> THAT (I) THE
FOREGOING PROVISIONS OF THIS SECTION 9.5 SHALL HAVE NO EFFECT ON THE
LIABILITY OF THE RELEASED PARTIES FOR GROSS NEGLIGENCE, WILLFUL
MISCONDUCT, FRAUD OR CRIMINAL CONDUCT AS DETERMINED BY A FINAL
ORDER OF THE BANKRUPTCY COURT AND (II) NOTHING HEREIN CONSTITUTES A
WAIVER OF ANY RIGHTS OR DEFENSES OF ANY RELEASED PARTIES WITH
RESPECT TO ANY SUCH ACTIONS, INCLUDING, WITHOUT LIMITATION,
DEFENSES RELATED TO VALIDITY, PRIORITY, AMOUNT AND TIMELINESS OF
SUCH CLAIMS.*

5.    <u>Exculpation</u>

For the avoidance of doubt, Exculpated Parties means, collectively, each solely in their
respective capacities as such, (a) all current and former members (including ex officio members),
officers, directors, managers and employees of the Plan Debtors or the Committee; (b) all
attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries,
and professionals of any Plan Debtor, the Committee or the members of the Committee; and
(c) each of their respective predecessors and successors in interest, and all of their respective
current and former members (including ex officio members), officers, directors, managers,
employees, attorneys, financial advisors, accountants, investment bankers, investment advisors,
actuaries, and professionals.

*EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE
DOCUMENTS EXECUTED PURSUANT TO THE PLAN, OR THE CONFIRMATION
ORDER, EACH EXCULPATED PARTY IS HEREBY EXCULPATED AND RELEASED
FROM ANY CLAIM, CAUSE OF ACTION OR LIABILITY TO ANY PERSON OR ENTITY
OR TO ANY HOLDER OF A CLAIM OR INTEREST, FOR ANY ACT OR OMISSION IN
CONNECTION WITH OR ARISING OUT OF THEIR PARTICIPATION IN THE CASES,
INCLUDING, WITHOUT LIMITATION, IN THE FORMULATION, CONFIRMATION,
CONSUMMATION, AND/OR ADMINISTRATION OF THE PLAN OR THE PROPERTY
TO BE DISTRIBUTED UNDER THE PLAN, EXCEPT IF SUCH ACT OR OMISSION IS
DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED GROSS NEGLIGENCE
OR WILLFUL MISCONDUCT, AND IN ALL RESPECTS, EACH OF SUCH PERSONS
SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL
WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES AND SHALL BE FULLY
PROTECTED IN ACTING OR IN REFRAINING FROM ACTION IN ACCORDANCE
WITH SUCH ADVICE.*

## VI.  <u>CONFIRMATION AND CONSUMMATION PROCEDURE</u>

**A.**      **Disclosure and Solicitation**

     This Disclosure Statement is presented to the Holders of Claims and Interests that are entitled to vote on the Plan to satisfy the requirements sections 1125 and 1126 of the Bankruptcy Code.  Section 1125 of the Bankruptcy Code requires that full disclosure be made to all Holders of Claims and Interests in impaired Classes which receive or retain property pursuant to a plan at the time, or before, solicitation of acceptances of such plan is commenced.

**B.**      **Acceptance of the Plan**

     As discussed in <u>Section III</u> of this Disclosure Statement, the Bankruptcy Code defines acceptance of a plan by a Class of creditors or interest-holders as acceptance by holders of more than two-thirds in dollar amount and more than one-half in number of the Claims of that Class that have timely voted on a plan.  A vote may be disregarded if the Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

     A vote to accept or reject the Plan can only occur by proper submission of a duly executed Ballot.  Failure of a Holder to vote does not constitute a vote to reject the Plan by that Holder.  Each Holder of a Claim or Interest should seek such independent legal and/or business advice as it deems appropriate regarding whether to vote to accept or reject the Plan.

**C.**      **Classification**

     The Plan Debtors are required under section 1122 of the Bankruptcy Code to classify the Claims and Interests into Classes that contain Claims and Interests that are substantially similar to the other Claims or Interests in such Class.  The Plan can be confirmed so long as there is at least one consenting Class of impaired Claims under the Plan (not including the votes of insiders), and so long as the other requirements for confirmation are met.

**D.**      **Confirmation**

     The Bankruptcy Code requires the Court, after notice, to hold a Confirmation Hearing. At the Confirmation Hearing, the Court will confirm the Plan only if all the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for Confirmation of the Plan are that the Plan be (i) accepted by all impaired Classes of Claims and Interests or, if rejected by an impaired Class, that the Plan "not discriminate unfairly" and be "fair and equitable" as to such impaired Class; (ii) feasible; and (iii) in the "best interests" of rejecting Holders of Claims and Interests impaired under the Plan.

     1.      <u>Acceptance</u>

     Classes 3A, 3B, 3C and 4 are impaired under the Plan and entitled to vote and, therefore, must accept the Plan in order for it to be confirmed except as described below under the heading *Confirmation Without Acceptance by All Impaired Classes*.  Because Classes 5 and 6 are

impaired under the Plan and deemed to have rejected the Plan under Section 1126(g) of the Bankruptcy Code, the Court must determine that the Plan is "fair and equitable" with respect to those rejecting Classes. The "fair and equitable" test is described below under the heading *Confirmation Without Acceptance by All Impaired Classes*.

    2.    <u>Feasibility</u>

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation should not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Plan Debtors or any successor to the Plan Debtors unless such liquidation is proposed in the Plan. The Plan is a liquidating plan. Accordingly, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code.

    3.    <u>Best Interests Test</u>

With respect to each impaired Class, confirmation of the Plan requires that each Holder of an Allowed Claim or Allowed Interest in such Class either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Plan Debtors were liquidated under chapter 7 of the Bankruptcy Code. In a chapter 7 liquidation case, Holders of General Unsecured Claims in Classes 3A, 3B and 3C could very possibly receive no Distributions from the Estates (in contrast to the expected Distributions under the Plan) due to the elimination of the IRS Settlement Agreement if no Plan is approved. Accordingly, the treatment provided to such Classes under the Plan is substantially better than such Classes would receive in a chapter 7 liquidation. See <u>Section IX</u>, *Alternatives to Confirmation and Consummation of the Plan*, for a further discussion of why the Plan Debtors believe that Plan is in the best interests of Holders of Claims and Interests.

    4.    <u>Confirmation Without Acceptance By All Impaired Classes</u>

The Bankruptcy Code provides that, so long as at least one Class of Claims that is impaired under the Plan accepts the Plan (without respect to the votes cast by insiders), the Plan Debtors may seek confirmation of the Plan over the objections of any non-consenting Class, provided that the Plan Debtors demonstrate that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Classes. These "cramdown" provisions for confirmation of the Plan, despite the non-acceptance of one or more impaired Classes of Claims or Interests, are set forth in Bankruptcy Code § 1129(b).

The Bankruptcy Code establishes different "fair and equitable" tests for Holders of Secured Claims, Unsecured Claims and Interests. The respective tests are as follows:

    (a)    Secured Creditors

Either (i) each impaired Holder of a Secured Claim of the rejecting Class (a) retains its liens in the collateral securing such Claim or in the proceeds thereof to the extent of the allowed amount of the Secured Claim and (b) receives deferred cash payments in at least the allowed amount of such Secured Claim with a present value at

the Effective Date at least equal to such creditor's interest in its collateral or in the proceeds thereof; or (ii) the Plan provides each impaired Holder of a Secured Claim with the "indubitable equivalent" of its Secured Claim.

(b)     General Unsecured Creditors

Either (i) each impaired Holder of a General Unsecured Claim of the rejecting Class receives or retains under the Plan property of a value equal to the amount of its Allowed Claim; or (ii) the Holders of Claims and Interests that are junior to the Claims of the dissenting Class do not receive or retain any property under the Plan.

(c)     Interest Holders

Either (i) each Interest Holder of the rejecting Class receives or retains under the Plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption prices, if any, of the Interest it holds or (b) the value of such Interest; or (ii) the Holders of Interests that are junior to such Interest do not receive or retain any property under the Plan.

The Plan Debtors believe that the Plan meets the applicable tests described above, even in the event that it is rejected by the Holders of one or more Classes of Claims and Interests.

## VII. <u>CERTAIN FEDERAL INCOME TAX CONSEQUENCES</u>

**A.      Federal Income Tax Consequences of the Plan**

Confirmation of a plan of liquidation can have a number of tax implications upon the Holders of Claims against or Interests in the Plan Debtors, including, without limitation, discharge/cancellation of indebtedness and capital gains/losses.  Given the relative size of the Plan Debtors' Estates and the diverse nature of the Holders of Claims or Interests, the Plan Debtors have not undertaken an analysis of the tax consequences of the Plan upon Holders of Claims or Interests.  Accordingly, Holders of Claims or Interests and other parties in interest should consult competent tax counsel and other professionals for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim or Interest.

THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS OR INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN MAY BE UNCERTAIN DUE TO, IN SOME CASES, THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE LAW.  NO RULING HAS BEEN APPLIED FOR OR OBTAINED FROM THE IRS WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN REQUESTED OR OBTAINED BY THE PLAN DEBTORS WITH RESPECT THERETO.

THIS DISCUSSION DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED.  ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY ENCOURAGED TO CONSULT WITH HIS, HER OR

ITS OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL, OR OTHER TAX CONSEQUENCES OF THE PLAN.

IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, WE INFORM YOU THAT ANY U.S. FEDERAL TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF (I) AVOIDING PENALTIES UNDER THE INTERNAL REVENUE CODE, OR (II) PROMOTING, MARKETING, OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR MATTER THAT IS CONTAINED IN THIS DISCLOSURE STATEMENT.

In connection with the Plan, to the extent applicable, the Plan Debtors or any agent thereof making Distributions in accordance with the Plan shall comply with all reporting and withholding requirements imposed on them by any governmental unit.

## VIII.  CERTAIN RISK FACTORS AND OTHER CONSIDERATIONS

> **PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

**A.    Parties in Interest May Object to the Plan Debtors' Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Plan Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Plan Debtors created eight Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**B.    Failure to Satisfy Vote Requirements**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Plan Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Plan Debtors may seek to accomplish an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar to, or as favorable to, the Holders of Allowed Claims as those proposed in the Plan.

**C.      Plan Debtors May Not Be Able to Secure Confirmation of the Plan**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non–accepting classes; (b) such plan is feasible; and (c) the value of distributions to non–accepting holders of claims and interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non–accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non–accepting Classes.  If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims would receive with respect to their Allowed Claims.

The Plan Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in a less favorable treatment of any non–accepting Class, as well as any Classes junior to such non–accepting Class, than the treatment currently provided in the Plan.  Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

**D.      Nonconsensual Confirmation**

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  The Plan Debtors believe that the Plan satisfies these requirements and the Plan Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion or confirm the Plan on a nonconsensual basis.

**E.**     **Plan Debtors May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Plan Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is, or may be, subject to an objection.  Any Holder of a Claim that is, or may be, subject to an objection thus may not receive its expected share of the estimated Distributions described in this Disclosure Statement.

**F.**     **Risk of Non-Occurrence of the Effective Date**

Although the Plan Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

**G.**     **Contingencies Will Not Affect Votes to Accept or Reject the Plan**

The Distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders the disallowance or reduction of certain Allowed Claims and the resolution of certain Causes of Action.  The occurrence of any and all such contingencies, which could affect Distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

**H.**     **Forward Looking Statements in this Disclosure Statement May Prove to be Inaccurate**

Many of the statements included in this Disclosure Statement contain forward-looking statements and information relating to the Plan Debtors.  These forward-looking statements are generally identified by the use of terminology such as "may," "will," "could," "should," "potential," "continue," "expect," "intend," "plan," "estimate," "project," "forecast," "anticipate," "believe," or similar phrases or the negatives of such terms.  These statements are based on the beliefs of the Plan Debtors as well as assumptions made using information currently available to the Plan Debtors.  Such statements are subject to risks, uncertainties and assumptions, as well as other matters not yet known or not currently considered material by the Plan Debtors.  Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results may vary materially from those anticipated, estimated or projected.  Given these risks and uncertainties, Holders of Claims or Interests are cautioned not to place undue reliance on such forward-looking statements.  Forward-looking statements do not guarantee future performance.  Holders of Claims or Interests should recognize these statements for what they are and not rely on them as facts.  None of the Plan Debtors undertakes any obligation to update or revise any of these forward-looking statements to reflect new events or circumstances after the date of this Disclosure Statement.

## IX.  ALTERNATIVES TO CONFIRMATION AND
## CONSUMMATION OF THE PLAN

If the Plan is not confirmed or consummated, the alternatives include, in addition to dismissal of the Cases, (i) liquidation of the Plan Debtors under chapter 7 of the Bankruptcy Code or (ii) an alternative chapter 11 plan.

A.        **Liquidation Under Chapter 7**

If no plan can be confirmed or the Bankruptcy Court determines other cause exists for conversion, the Cases may be converted to cases under chapter 7 of the Bankruptcy Code.  In chapter 7, a trustee would be elected or appointed to liquidate the assets of the Plan Debtors for distribution to creditors in accordance with priorities established by the Bankruptcy Code.

The Plan Debtors believe that liquidation under chapter 7 could very possibly result in no Distributions to Holders of General Unsecured Claims (in contrast to the expected Distributions under the Plan) due to the elimination of the IRS Settlement Agreement if no Plan is approved. Absent the IRS Settlement Agreement, the Plan Debtors and the IRS would return to their dispute and likely would pursue the appeal of the Tax Court Decision.  If the IRS prevailed concerning the tax deficiency portion of the appeal, the tax deficiency claim would be a Bankruptcy Code section 507(a)(8) Priority Tax Claim.  The amount of such a Priority Tax Claim would substantially exceed the total amount of the assets in the Plan Debtors' estates.  As a result, under such circumstances the Plan Debtors would not be able to pay the IRS's Priority Tax Claim in full and likely would not be able to make any distributions to Holders of General Unsecured Claims.  Thus, conversion to chapter 7 of the Bankruptcy Code likely would eliminate Distributions for Holders of General Unsecured Claims unless the Plan Debtors prevailed on the tax deficiency portion of the appeal of the Tax Court Decision.  Although the Plan Debtors strongly believe that the Tax Court Decision is erroneous, the Tax Court decided otherwise and appellate courts could uphold the Tax Court Decision.  Therefore, conversion to chapter 7 of the Bankruptcy Code presents a substantial risk that Holders of General Unsecured Claims would receive no Distributions.

Moreover, the Plan Debtors could incur substantial expenses in connection with an appeal of the Tax Court Decision.  The payment of such expenses would reduce the funds otherwise available for Distributions and resolving the appeal would delay any such Distributions.

Similarly, even absent the expense and delay associated with an appeal of the Tax Court Decision, conversion to chapter 7 and the appointment of a chapter 7 trustee would result in substantial additional Administrative Claims related to the attorneys and other professionals necessary to assist such trustee and their need to extensively study the Cases in order to fulfill their fiduciary duties.  Conversion to chapter 7 also would result in delays attendant to the chapter 7 trustee's need to analyze issues and research the background of the Plan Debtors, their assets and liabilities and the recovery analysis.

As a result of the foregoing, the Plan Debtors believe that Holders of Allowed General Unsecured Claims would not receive greater Distributions under a chapter 7 liquidation than they will receive under the Plan.

**B.        Alternative Plan(s) of Reorganization**

The Plan Debtors believe that the transactions and settlements reflected in the Plan and this Disclosure Statement will result in quicker and higher recoveries for all constituencies than any alternative scenario.    In particular, the Plan complies with the requirements of the IRS Settlement Agreement and provides for Distributions to other Holders of Claims in accordance with the priorities set forth in the Bankruptcy Code.

**C.        Recommendation**

The Plan Debtors believe that confirmation and implementation of the Plan are preferable to the above-described alternatives and recommend that all eligible Claim Holders vote in favor of the Plan.

# X.  CONCLUSION

The Plan Debtors believe that acceptance of the Plan is in the best interest of Claim Holders and recommend that all eligible Claim Holders vote to accept the Plan.

**CANAL CORPORATION (f/k/a CHESAPEAKE CORPORATION)**

By: _/s/ J.P. Causey Jr._____
        Name: J.P. Causey Jr.
        Title:  Executive Vice President and Secretary

**CANAL NC COMPANY (f/k/a CHESAPEAKE PRINTING AND PACKAGING COMPANY)**

By: _/s/ J.P. Causey Jr._____
        Name: J.P. Causey Jr.
        Title:  Vice President

**CANAL NY COMPANY, INC. (f/k/a CHESAPEAKE PHARMACEUTICAL PACKAGING COMPANY, INC.)**

By: _/s/ J.P. Causey Jr._____
        Name: J.P. Causey Jr.
        Title:  Vice President

**CANAL IH COMPANY (f/k/a CHESAPEAKE INTERNATIONAL HOLDING COMPANY)**

By: _/s/ J.P. Causey Jr._____
        Name: J.P. Causey Jr.
        Title:  Vice President

**SHEFFIELD, INC.**

By: _/s/ J.P. Causey Jr._____
        Name: J.P. Causey Jr.
        Title:  President

**CANAL RESOURCES COMPANY (f/k/a CHESAPEAKE ASSETS COMPANY)**

By: *  /s/ J.P. Causey Jr.*
      Name: J.P. Causey Jr.
      Title:  President

**CANAL YR COMPANY (f/k/a CHESAPEAKE RECYCLING COMPANY)**

By: *  /s/ J.P. Causey Jr.*
      Name: J.P. Causey Jr.
      Title:  President

**CANAL D&P COMPANY (f/k/a CHESAPEAKE DISPLAY AND PACKAGING COMPANY)**

By: *  /s/ J.P. Causey Jr.*
      Name: J.P. Causey Jr.
      Title:  Secretary

**CANAL VIRGINIA COMPANY (f/k/a THE CHESAPEAKE CORPORATION OF VIRGINIA)**

By: *  /s/ J.P. Causey Jr.*
      Name: J.P. Causey Jr.
      Title:  President

**CANAL CORPORATION (WISCONSIN) (f/k/a CHESAPEAKE CORPORATION (WISCONSIN))**

By: *  /s/ J.P. Causey Jr.*
      Name: J.P. Causey Jr.
      Title:  President

**CANAL CORPORATION (MASSACHUSETTS) (f/k/a CHESAPEAKE CORPORATION (MASSACHUSETTS))**

By: *  /s/ J.P. Causey Jr.*
      Name: J.P. Causey Jr.
      Title:  President

**CANAL CORPORATION (D.C.) (f/k/a CHESAPEAKE CORPORATION (D.C.))**

By: _/s/ J.P. Causey Jr._
      Name: J.P. Causey Jr.
      Title:  President

**CANAL CORPORATION (ILLINOIS) (f/k/a CHESAPEAKE CORPORATION (ILLINOIS))**

By: _/s/ J.P. Causey Jr._
      Name: J.P. Causey Jr.
      Title:  President

**CANAL CORPORATION (LOUISIANA) (f/k/a CHESAPEAKE CORPORATION (LOUISIANA))**

By: _/s/ J.P. Causey Jr._
      Name: J.P. Causey Jr.
      Title:  President

**CANAL FP COMPANY, LLC (f/k/a CHESAPEAKE FOREST PRODUCTS COMPANY, LLC)**

By: _/s/ J.P. Causey Jr._
      Name: J.P. Causey Jr.
      Title:  Vice President

**CANAL DE COMPANY (f/k/a CARY ST. COMPANY)**

By: _/s/ J.P. Causey Jr._
      Name: J.P. Causey Jr.
      Title:  Director

**CANAL DP COMPANY (f/k/a DELMARVA PROPERTIES, INC.)**

By: _/s/ J.P. Causey Jr._
      Name: J.P. Causey Jr.
      Title:  Vice President

**CANAL SH COMPANY (f/k/a STONEHOUSE INC.)**

By:   */s/ J.P. Causey Jr.*
          Name: J.P. Causey Jr.
          Title:   Vice President